# Richmond.

## HAGAN v. CITY OF RICHMOND.

### December 14, 1905.

1. INTERSTATE COMMERCE—*Obstructing Harbors—Removal of Wrecks—Action by Congress—Concurrent Jurisdiction of State.*—Conceding the paramount authority of Congress to assume absolute and exclusive control over the navigable waters of the United States, still it has not chosen to exercise that power in the matter of removing wrecks from harbors within a State, and the State may, in aid of commerce, enact appropriate laws for the removal of obstructions from harbors and navigable streams wholly within its limits, when not in conflict with any act of Congress or system provided by it. The mere fact that Congress has legislated on the subject does not deprive the State of all jurisdiction in the premises. Section 19 of the River and Harbor Bill (30 U. S. Stat. at Large, p. 1154), relating to the removal of obstructions from navigable rivers and harbors is not restrictive of the power of the State to enact appropriate legislation to accomplish the same ends.

2. INTERSTATE COMMERCE—*State Statutes—Incidentally Affecting.*—Although a State statute may incidentally affect interstate commerce, it is not necessarily an obstruction, but may be in aid of commerce and a valid exercise of the police power of the State.

3. INTERSTATE COMMERCE—*Removing Wrecks—Personal Liability of Owner of Vessel—Policy of Congress Exclusive—Code, Sec. 2011 Invalid.*—Inasmuch as Congress has outlined a definite policy of limiting the liability of owners of ships and vessels, lost without personal negligence on their part, to the value of the ship or vessel and "her freight then pending" (Rev. Stats. U. S. Sec. 4283, and 30 U. S. Stat. at Large, p. 1154), its enactments on this subject are paramount, and Sec. 2011 of the Code, and Sec. 8, ch. 77 of the ordinances of the City of Richmond in so far as they provide for

the removal, "at the expense of the owner," of wrecked vessels obstructing the harbor in the City of Richmond, are invalid, unless the obstruction occurred with the knowledge and privity of such owner.

Error to a judgment of the Circuit Court of the city of Richmond in an action of assumpsit.    Judgment for the plaintiff.    Defendant assigns error.

*Reversed.*

The facts of this case, which are undisputed, and the sections of the Code and charter and ordinances of the city of Richmond relied on to sustain the demand asserted by the city against the plaintiff in error, are set out in the opinion of the judge of the Circuit Court as follows:

"It appears from the facts developed in this case that defendant's barge, 'John Hagan,' loaded with coal, from Philadelphia, Pa., to Richmond, Va., when nearing Richmond struck a rock, filled with water, and, before it could reach the wharf, sunk in the harbor of Richmond on July 3, 1898, thereby obstructing navigation; that in the same month the Council Committee of the city of Richmond took the matter up with the owner, Peter Hagan, and endeavored to have him remove the wreck.

"The various proceedings of this committee, the correspondence, and the resolutions adopted, are in evidence.    It appears therefrom that this sunken barge was a serious menace to navigation as it lay in the harbor, that after it had been there several months, the house on top of it was washed away and there was nothing to mark it.    More than a year elapsed, during which demand after demand was made by the city upon Hagan to remove it, but he still delayed.    Then it was that the city took final action and had the barge blown up and removed from the harbor, at a cost of $442.75, which sum was demanded from Hagan, but he refused payment.    The city instituted this action in October, 1899, to recover the amount expended.

"The whole question of law and fact, a jury having been waived, was submitted to the court.

"The city, to support its action, introduced sections 2011 (as amended by Acts, 1889-90, p. 624), 2012, 2013 and 2014 of V. C. 1887; section 19, sub-section 6, of the charter of the city of Richmond; and ch. 77, sec. 8, of the city ordinances.

"Sec. 2011.    'They (the Board of Harbor Commissioners of Norfolk and Portsmouth) shall have authority to cause the removal of any wharf, dock, wreck, or other obstruction to navigation, or that may, in their opinion, be injurious to the harbor, or that may cause shoaling at any point in the channel of said river, its branches or tributaries, at the expense of the owner or party causing the obstruction; provided, the rights of any owner of a wharf whose lines have been heretofore fixed by authority of law shall in no way be disturbed.'

"Sec. 2012.    'The said board, if in their judgment expedient, may employ the services of a competent engineer at any time, who may make a survey of any waters lying within their jurisdiction, and perform such other duties as the board may require of him.'

"Sec. 2013.    'When any dredging is done in any of the waters aforesaid, the board shall have power to designate the places at which the dredging material shall be dumped.'

"Sec. 2014.    'The said board shall have power to make and enforce such rules and regulations for the preservation of the harbor, its police government, and the better use of the wharf, mooring, and other facilities thereof, as they may from time to time deem proper.'

"Sec. 19.    Sub-section 6 of the city charter. (The city council shall have power to make such ordinances, by-laws, orders, and regulations as they may deem desirable to carry out the following powers, which are hereby vested in them:) 'To establish, construct, and keep in order, alter or remove, landings, wharves, and docks on lands belonging to the city; and to lay and collect a reasonable duty on vessels coming to and using

the same, and to regulate the manner of using other wharves and landings within the corporate limits; to prevent or remove all obstructions in and upon any landings, wharves, or docks. They may also appoint port-wardens for the port of said city, who shall exercise such powers as the council may give them up to the port-warden's lines, as they may be established from time to time by the United States Government, and fix their fees and compensation. The said city shall have power to improve and keep in good, safe, and navigable condition the harbor of James river within the corporate limits. The city council of said city shall have all the powers set forth in sections two thousand and eleven, two thousand and thirteen, and two thousand and fourteen of the Code of Virginia, eighteen hundred and eighty-seven, which powers it may delegate to some proper committee of persons satisfactory to said council.'

"Chap. 77, sec. 8, of the City Ordinances. 'The committee on improvement of James river shall have power to fix lines along said harbor within which riparian owners may erect wharves, docks and proper structures and fixures for commercial and manufacturing purposes.'

" 'They shall have authority' to cause the removal of any wharf, dock, wreck, or other obstructions to navigation, or that may, in their opinion, be injurious to the harbor, or that may cause shoaling of said harbor, its branches or tributaries, at the expense of the owners or the party causing the obstruction, provided, the rights of any owner of a wharf whose lines have been heretofore fixed by authority of law shall in no way be disturbed.'

"Also, witnesses were introduced to prove the various steps taken by the city in order to have the sunken barge removed.

"It was admitted that the harbor of Richmond was within the corporate limits, and that the James river was wholly within the confines of the State of Virginia.

"The city proved that the sum expended, and for which it brought its action, was a reasonable and necessary expenditure

for the public benefit in order to keep the harbor open for navigation, and, further, that every possible opportunity was given to Hagan to remove the barge before action was taken, even waiting for more than a year, and it only acted in the face of the advance of fall and winter, when navigation would be rendered more dangerous."

The plaintiff in error, Hagan, on the other hand, rests his defense upon the commerce clause of the Constitution of the United States (Art. I, sec. 8, cl. 3); section 19 of the act of Congress of March 3, 1899—the river and harbor bill—(30 U. S. Stat. at L., p. 1154); and the Limited Liability Act (sec. 4283 Rev. Stat. U. S.).

*Jno. A. Lamb, Hamilton Rogers* and *Ro. H. Talley,* for the plaintiff in error.

*H. R. Pollard,* for the defendant in error.

WHITTLE, J. (after making the foregoing statement of the case), delivered the opinion of the court.

Two questions are submitted upon this writ of error for our determination.

1. It is insisted on behalf of the plaintiff in error, that section 19 of the River and Harbor Bill was intended to invest the Secretary of War with exclusive jurisdiction in the matter of removal of obstructions contemplated by the statute from the navigable waters of the United States.

The section is as follows: "That whenever the navigation of any river, lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed or endangered by any sunken vessel, boat, water craft, raft, or other similar obstruction, and such obstruction has existed for a longer period than thirty days, or whenever the abandonment of such obstruc-

tion can be legally established in a less space of time, the sunken vessel, boat, water craft, raft, or other obstruction shall be subject to be broken up, removed, sold or otherwise disposed of by the Secretary of War at his discretion, without liability for any damage to the owners of the same. Provided, that in his discretion, the Secretary of War may cause reasonable notice of such obstruction of not less than thirty days, unless the legal abandonment of the obstruction can be established in a less time, to be given by publication, addressed 'To Whom It May Concern,' in a newspaper published nearest to the locality of the obstruction, requiring the removal thereof; and provided also, that the Secretary of War may, in his discretion, at or after the time of giving such notice, cause sealed proposals to be solicited by public advertisement, giving reasonable notice of not less than ten days, for the removal of such obstruction as soon as possible after the expiration of the above specified thirty days' notice, in case it has not in the meantime been so removed, these proposals and contracts, at his discretion, to be conditioned that such vessel, boat, water craft, raft, or other obstruction, and all cargo and property contained therein, shall become the property of the contractor, and the contract shall be awarded to the bidder making the proposition most advantageous to the United States. Provided, that such bidder shall give satisfactory security to execute the work. Provided, further, that any money received from the sale of any such wreck, or from any contractor for the removal of wrecks, under this paragraph, shall be covered into the treasury of the United States."

It must be allowed, that in the absence of Legislation on the subject by Congress, it would be within the competency of the several States, in the interest of their citizens and in the reasonable exercise of their police power, to remove obstructions from rivers and harbors, and other navigable waters of the United States, wholly within their limits. If it were true, as contended, that the mere fact that Congress had legislated on

the subject divested the States of all jurisdiction in the premises, it would deprive them of many conceded rights as to which they exercise concurrent jurisdiction with the United States.

The paramount authority of Congress to assume such absolute and exclusive control over the navigable waters of the United States may be conceded.   But it is plain from an examination of section 19 that it has not chosen to exercise that power. in the present instance.   If it had been the design of Congress to deprive the States of the important and essential right to police the rivers and harbors within their respective limits, it is inconceivable that it would have declared that purpose in language of doubtful import.   There is nothing in the phraseology of the section to warrant that construction; but, on the contrary, the object of the enactment was evidently intended to clothe the Secretary of War with large discretionary powers which he might exert or leave to the enforcement of local authorities, as his judgment might dictate.   The object of the legislation is to keep the navigable waters of the United States clear and unobstructed; and supplemental legislation, on the part of the States in furtherance of that design is in aid of commerce, and where not in conflict with any system adopted by Congress, is universally upheld.   The States have no control over the discretion of the Secretary of War, and if he should fail or decline to act in a given case, it would be most unreasonable to hold that the local authorities are powerless to protect their domestic commerce by keeping navigable waters, wholly within their respective limits, unobstructed.

The correspondence between an officer. of the War Department and the city engineer shows that he so interpreted the act of Congress, because, while he states that an appropriation had been made for the purpose and he had been authorized to remove the wreck, he interposed no objection to the city authorities removing it, and pointed out the best method to accomplish it.

But we find abundant authority to sustain the concurrent jurisdiction of the Federal and States Governments in this class of cases.

The doctrine is thus stated by Ray in his work on Negligence of Imposed Duties, at pp. 483-4: "So long as the State legislation is not in conflict with any law passed by Congress, in pursuance of its powers, and is merely intended and operates, in fact, to aid commerce, and to expedite instead of hindering the safe transportation of persons and commodities from one Commonwealth to another, it is not repugnant to the Constitution of the United States, and will be enforced either as supplementary to partial Federal statutes relating to the same subject, or in lieu of such legislation where Congress has not exercised its power at all."

In Southerland's notes on the United States Constitution (Ed. of 1904), pp. 102, 104, it is said: "The States have concurrent powers with Congress in matters which are local in their operation, or which are mere aids to commerce, or which relate to rights, duties and liabilities of citizens, although indirectly and remotely affecting operations of commerce; e. g., the regulation of wharves, the establishment of buoys and beacons, the improvement of harbors. . . . When, however, Congress has acted with relation to such matters as these, State laws in conflict with congressional action are void, and while the commerce clause does not comprehend internal domestic commerce, the power enters the interior of every State whenever the interests of foreign or interstate commerce require."

Again, it is said in Ray on Negligence of Imposed Duties, at p. 496: "within the second class of cases—that is of what might be termed concurrent jurisdiction—are embraced laws for the regulation of pilots; quarantine and inspection laws; and the policing of harbors; the improvement of navigable channels; the regulation of wharves, piers and docks; the construction of dams and bridges across navigable waters; and the establishment of ferries."

The concurrent jurisdiction of the United States and of the several States, in supplying local aids and instrumentalities, in respect to commerce, is fully recognized in the opinion of Chief Justice Taney, in the case of *The James Gray* v. *The Ship John Fraser*, 21 How. 184, 16 L. Ed. 106, where it was held, that an ordinance of the city of Charleston prescribing what part of the harbor a vessel should occupy, how long she might remain in port, the character of lights she should display at night, and other similar regulations, was not in conflict with the act of Congress regulating commerce and the general admiralty jurisdiction conferred on the United States courts, and is valid.

In *Faust* v. *City of Cleveland*, (from the Circuit Court of Appeals, Sixth Circuit), 121 Fed. 810, it was said: "The river Cuyahoga is a navigable river, and, as such, is subject to the control of Congress, and to its regulations and general supervision. But the interest of the State in its own domestic commerce is such that the regulation of Congress is not necessarily exclusive of all control or authority by the State. It has therefore been held that legislation by the State for the purpose of aiding commerce by the improvement of such streams by providing for the deepening of the channels or the removal of obstructions, does not encroach upon the power of Congress, if not in conflict with any system for their improvement provided by Congress." Citing *Mobile* v. *Kimball*, 102 U. S. 691, 26 L. Ed. 238, in which case Mr. Justice Field, in an able and exhaustive opinion sustained the validity of an act of the Legislature of Alabama providing for the improvement of the river, bay and harbor of Mobile, as not conflicting with the power of Congress under the Commerce Clause of the Constitution.

In the case of *Lake Shore, &c., R. Co.* v. *Ohio, &c.*, 173 U. S. 285, 43 L. Ed. 702, 19 Sup. Ct. 465, Mr. Justice Harlan observes, that the decisions of that court recognize "the fundamental principle, that outside of the field directly occupied

by the general government, under the powers granted to it by the Constitution, all questions arising within a State that relate to its internal order, or that involve the public convenience or the general good, are primarily for the determination of the State, and that its legislative enactments relating to these subjects and which are not inconsistent with the State Constitution are to be respected and enforced by the courts of the Union, if they do not, by their operation, directly intrench upon the authority of the United States, or violate some right protected by the National Constitution. The power here referred to is, to use the words of Chief Justice Shaw, the power to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the Commonwealth ,and of the subjects of the same." Citing *Commonwealth* v. *Alger*, 7 Cush. 53, 85. .

The *Postal Tel. Co.* v. *Umstadter*, 103 Va. 742, 50 S. E. 259, is one of a line of cases in this court to the effect, that although a State statute may incidentally affect interstate commerce, it is not necessarily an obstruction, but may be in aid of commerce, and a valid exercise of the police power of the State. The principle is illustrated by numerous decisions of the Supreme Court of the United States, which sustain the validity of State legislation of the character involved in the first branch of our inquiry. *Gibbons* v. *Odgen*, 9 Wheat, 196, 6 L. Ed. 73; *Brown* v. *Maryland*, 12 Wheat. 419, 446, 6 L. Ed. 678; *Sinnot* v. *Davenport*, 22 How. 227, 243, 16 L. Ed. 243; *Railway Co.* v. *Fuller*, 17 Wall. 560, 21 L. Ed. 710; *Brown* v. *Huston*, 114 U. S. 630, 29 L. Ed. 257, 5 Sup. Ct. 1091; *Lake Shore, &c., Ry. Co.* v. *Ohio*, 165 U. S. 365, 368, 41 L. Ed. 747, 17 Sup. Ct. 357; *Missouri, &c., Ry. Co.* v. *Hoover*, 169 U. S. 613, 42 L. Ed. 878, 18 Sup. Ct. 488; *Cummings* v. *Chicago*, 188 U. S. 410, 428, 47 L. Ed. 525, 23 Sup. Ct. 472; *Montgomery* v. *Portland*, 190 U. S., 89, 106, 47 L. Ed. 965, 23 Sup. Ct. 735.

2. The second contention of plaintiff in error is that the Circuit Court erred in rendering a personal judgment against him for the expense incurred by the city in blowing up and removing the sunken barge "John Hagan" from its harbor.

In that connection it is insisted that sec. 19 of the River and Harbor Bill and sec. 4283 of the Revised Statutes of the United States provide, that there shall be no personal liability upon the owner of a vessel in a case such as we are considering.

The latter section reads: "The liability of the owner or owners of any ship or vessel, for any embezzlement, loss or destruction by the master, officers, passengers, or any other person or persons, of any property, goods, or merchandise, shipped or put on board of such ship or vessel, or for any loss, damage or injury by collision, or for any act, matter or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners shall in no case exceed the amount or value of the interest of such owner or owners, respectively, in such ship or vessel, and her freight then pending."

This limited liability act is said to be the outgrowth of modern maritime law and codes. The first act of Congress on the subject was passed March 3, 1851; and in the case of *Norwich & N. Y. Trans. Co.* v. *Wright,* 13 Wall, 104, 20 L. Ed. 585, the policy of the legislation is explained by Mr. Justice Bradley as follows: "The great object of the law was to encourage shipbuilding, and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline. Those who are willing to manage and work ships are generally unable to build and fit them. They have plenty of hardiness and personal daring and enterprise, but they have little capital. On the other hand, those who have capital, and invest it in ships, incur a very large risk in exposing their property to the hazards of the sea, and to the management of seafaring men, without making them liable for additional

losses and damage to an indefinite amount. How many enterprises in mining, manufacturing, and internal improvements, would be utterly impracticable if captialists were not encouraged to invest in them through corporate institutions by which they are exempt from personal liability, or from liability except to a limited extent? The public interests require the investment of capital in shipbuilding quite as much as in any of these enterprises. And, if there exist good reasons for exempting innocent ship-owners from liability, beyond the amount of their interest, for loss or damage to goods carried in their vessels, precisely the same reasons exist for exempting them to the same extent from personal liability in cases of collision. In the one case, as in the other, their property is in the hands of agents whom they are obliged to employ."

We think it quite clear, in light of the foregoing exposition of the limited liability act that where a vessel is lost without the privity or knowledge of the owner, he is only liable to the extent of his interest in the vessel, and cannot be held personally responsible for expenses incurred by local authorities in removing the wrecked vessel from their harbor. Hughes on Admiralty, p. 321.

As remarked, that is also the measure of liability fixed by section 19 of the United States River and Harbor Hill, *supra;* and it follows from the authorities cited, that, inasmuch as Congress has outlined a definite policy limiting the liability of owners of ships and vessels lost without personal negligence on their part, its enactments are paramount, and section 2011 of the Code and section 8 of Ch. 77 of the Ordinances of the City of Richmond, in so far as they declare that the Board of Harbor Commissioners and the Committee on Improvements of James River shall have authority to cause the removal of any wreck which in their opinion is injurious to the harbor, "at the expense of the owner," are in conflict with that policy and invalid unless the obstruction occurs with the privity or knowledge of such owner,

For these reasons, we are of opinion that the Circuit Court erred in rendering a personal judgment against the plaintiff in error in this instance, and for that error its judgment must be reversed.

*Reversed.*