EDMUND WILSON, attorney-general of the State of New Jersey,

v.

HUDSON COUNTY WATER COMPANY et al.

[Decided January 14th, 1910.]

1. The State of New Jersey is the owner in fee of all the lands below high-water mark in navigable tidewaters and arms of the sea within its borders in virtue of its sovereignty as successor to the king of England; and such ownership extends from ordinary high-water mark to the centre of the Kill von Kull, which is the boundary line between the States of New Jersey and New York.

2. The provisions of section 10 of the act of congress of March 3d, 1899, commonly called the River and Harbor act, were designed to protect the navigable waters of the United States (including the Kill von Kull) from encroachment and from obstructions to navigation, and to commit the duty of their protection to an officer of the federal government, without whose permission no such obstructions can be made. The act is a mere regulation for the benefit of commerce and navigation, and the license or permission of the secretary of war is only a finding and declaration that a proposed structure or excavation would not interfere with or be detrimental to navigation, and is not equivalent to a positive declaration by the authority of congress that the licensee may make such obstruction or excavation without first obtaining the consent of the owner of the submerged land. It is not an enactment touching the rights of the owner of such land, and the license given to the Hudson County Water Company by the secretary of war to excavate in and lay pipes across the Kill von Kull from Bayonne, in New Jersey, to Staten Island, in New York, is a mere declaration by the official named that the proposed work will not interfere with navigation, is strictly permissive, and

is not an authority to do the work in the absence of consent thereto by the State of New Jersey, the owner of the land.

3. The proposed excavation and laying of a pipe line through the lands of the State of New Jersey under the waters of the Kill von Kull by the Water Company without the consent of the state is an act in excess of the Water Company's corporate powers, and will be arrested by a preliminary injunction without the necessity of irreparable injury to the state's rights being shown.

On application for preliminary injunction.

*Mr. Edmund Wilson, attorney-general,* for the State of New Jersey.

*Mr. Robert H. McCarter,* for the defendants.

WALKER, V. C.

The attorney-general has filed an information on behalf of the state in which he shows that the J. M. Guffey Petroleum Company obtained from the riparian commissioners a grant of lands under the waters of the Kill von Kull at the foot of Ingham avenue in Bayonne. In the grant it was provided that that part of the land under water lying between the exterior line for piers and the exterior line of solid filling, established by the commissioners appointed under our act of the legislature and approved by the secretary of war, was not to be used for any purpose whatever except the erection of a pier or piers underneath which the tide might ebb and flow; and it was further provided that the state might grant or lease any of the lands of the state lying in front of the exterior line for solid filling or piers mentioned and referred to, for the cultivation of oysters or other fish, or for any other purpose whatever, provided that such grant should not operate to interfere with the reasonable use of, and access by water to, the lands under water thereby conveyed or with the free and uninterrupted navigation between its lands and the main channel of the Kill von Kull. The information further shows that the state has not made any grant or lease for any purpose whatever of any of its lands lying in front of the exterior line for solid filling or piers above mentioned, or piers in the grant to the J. M. Guffey Petroleum Company, and that the

state is the owner of all the land lying under the waters of the Kill von Kull to the middle thereof from the exterior line for piers referred to in the grant. That between the last mentioned exterior line and the boundary line in the Kill von Kull between the States of New Jersey and New York is approximately five hundred feet. That the defendant, the Hudson County Water Company, is now and for some time past has been dredging the land under the waters of the Kill von Kull in a line approximately parallel to Ingham avenue, Bayonne, and extending from the northerly shore of the Kill von Kull on the New Jersey side to and beyond the middle of the Kill, which middle is the boundary line between the States of New Jersey and New York; and that the dredging is being done for the purpose of placing submerged pipes thirty inches in diameter under the surface of the bed of the Kill, and that it is the purpose of the defendant to lay its line of pipes from the exterior line for solid filling granted to the J. M. Guffey Petroleum Company to the centre line of the Kill von Kull, a distance of approximately six hundred and seventy-five feet, without any lawful warrant or authority therefor.

Upon filing the information, duly verified, an order was made requiring the defendants, the Hudson County Water Company and the J. M. Guffey Petroleum Company (which will hereinafter be called respectively the Water Company and the Guffey Company), to show cause why they and their officers, agents and servants should not be enjoined and restrained from dredging, or permitting to be dredged, any of the lands of the State of New Jersey lying in front of the exterior line for solid filling, referred to in the riparian grant to the Guffey Company, for the purpose of laying pipes thereon, and from laying any pipe or pipes on any of the lands under the waters of the Kill von Kull from such exterior line to the middle of the Kill, which order contained an *ad interim* stay.

And now, on the return of the order to show cause, the Water Company, one of the defendants, files its answer, and moves the court to discharge the order and vacate the restraint.

The answer sets up that prior to the issuance of the restraining order the Water Company had been engaged in dredging the

land in question for the purpose of placing two submerged steel or iron pipes underneath the surface of the bed of the Kill to enable it to transport water therein to Staten Island, in the State of New York, for the purpose of supplying the borough·of Richmond, in that state, with water, pursuant to certain contracts made between it (the Water Company) and the city of New York, which pipes are to be connected with pipes belonging to the Water Company connected with wells on its lands in the township of Bellville, in the county of Essex, in this state, for the purpose of transporting water pumped, and to be pumped, from the wells to Staten Island, and by virtue of its contractual obligations with the city of New York, a citizen of the State of New York, for the purpose of supplying it with water as a commodity, the Water Company is advised that, under the law of the land, it is justified and authorized to do the work threatened and complained of, and in so doing it will be engaged in interstate commerce, and that the pipes so to be laid in the bed of the Kill von Kull, which is a navigable stream, partly in the State of New Jersey and partly in the State of New York, will be appliances and facilities of such interstate commerce. That prior to the commencement of the work of excavation, and on or about December 9th, 1904, pursuant to the terms and provisions of section 10 of the so-called River and Harbor bill of the congress of the United States, approved March 3d, 1899, the Water Company laid before the chief engineer of the United States army and procured his recommendation, and also procured from and by the authority of the acting secretary of war, a license to lay pipes in the bed of the Kill von Kull. That by virtue of the authority bestowed by the constitution of the United States upon congress to regulate commerce between the states, congress was authorized to enact section 10 of the so-called River and Harbor bill, and that the secretary of war, upon the recommendation of the chief of engineers, was likewise authorized and empowered to give the license above mentioned, and that the Water Company, under that license, is justified in dredging the bed of the Kill von Kull for the purpose of laying pipes therein without the sanction and permission, and in spite of the objection, of the State of New Jersey, and that its federal license is supreme and

sufficient to justify it in digging the trench and laying therein the water pipes for the purpose above indicated. That before commencing dredging, the Water Company procured from the Guffey Company a grant or license to lay pipes in, over and along its riparian lands, and thereby procured and enjoys the right to lay the pipes in, over and along the only private property in the State of New Jersey, or private rights, which the pipes when laid will in any way invade or affect. The defendant denies that the State of New Jersey is the owner of all the lands lying under the waters of the Kill von Kull from the exterior line for piers mentioned in the grant to the Guffey Company to the extent of being thereby endowed with any rights therein as against the federal government or its licensee when engaged in constructing an instrumentality of interstate commerce. And, finally, the Water Company claims a right under the constitution and laws of the United States, and says that this case presents a controversy arising under such constitution and laws, and that the effort of the informant to arrest or interfere with it in the execution of its plans, is contrary to the constitution and laws of the United States, and prays the benefit and advantage thereof.

As already said the information alleges that the state is the owner of all the land lying under the waters of the Kill von Kull to the middle thereof, and, while the answer denies that the state is the owner of those lands to the extent of being thereby endowed with any rights as against the federal government or its licensee when engaged in constructing an instrumentality of interstate commerce, there is no denial of the fact of the state's ownership of the land. By the settled law New Jersey is the owner in fee of all the lands below high-water mark in navigable tidewaters and arms of the sea within its boundary in virtue of its sovereignty as successor to the king of England. *Arnold* v. *Mundy, 6 N. J. Law (1 Halst.) 1, 77; Gough* v. *Bell, 21 N. J. Law (1 Zab.) 156; Attorney-General* v. *Hudson Tunnel Railroad Co., 27 N. J. Eq. (12 C. E. Gr.) 176, 181; Simpson* v. *Moorhead, 65 N. J. Eq. (20 Dick.) 623.* And such ownership extends from ordinary high-water mark to the centre of the

Kill von Kull, which is the boundary line between the States of
New Jersey and New York. This is not denied by the Water
Company but is tacitly admitted in its answer. See, also, *Stock-
ton* v. *Baltimore and New York Railroad Co., 32 Fed. Rep. 9.*

There are no disputed facts, and the verified answer of the
Water Company imports into the case the question of its alleged
rights in the premises under the constitution and laws of the
United States and the action of the officers of the federal gov-
ernment in pursuance of powers conferred by act of congress.

The power to do the thing proposed is said to exist under sec-
tion 10 of the act of March 3d, 1899, which section reads as
follows:

"Sec. 10. That the creation of any obstruction not affirmatively
authorized by congress, to the navigable capacity of any of the waters of
the United States is hereby prohibited; and it shall not be lawful to
build or commence the building of any wharf, pier, dolphin, boom, weir,
breakwater, bulkhead, jetty, or other structures in any port, roadstead,
haven, harbor, canal, navigable river, or other water of the United States,
outside established harbor lines, or where no harbor lines have been
established, except on plans recommended by the chief of engineers and
authorized by the secretary of war; and it shall not be lawful to excavate
or fill, or in any manner to alter or modify the course, location, condition
or capacity of any port, roadstead, haven, harbor, canal, lake, harbor of
refuge, or inclosure within the limits of any breakwater, or of the channel
of any navigable water of the United States, unless the work has been
recommended by the chief of engineers and authorized by the secretary of
war prior to beginning the same."

So much of the section just quoted as may be said to have any
application to the case in hand may be stated thus:

"The creation of any obstruction to the navigable capacity
of any of the waters of the United States is prohibited, and it
shall not be lawful to build any structure in any navigable
water of the United States outside established harbor lines or
where no harbor lines have been established, except on plans
recommended by the chief of engineers and authorized by the
secretary of war; and it shall not be lawful to excavate or fill
in any navigable water of the United States unless the work has
been recommended by the chief of engineers and authorized by
the secretary of war."

It is conceded that the proper recommendation and authority from the federal officials have been obtained, and the question is, Is it plenary or permissive only?

The Water Company claims that it is engaged in interstate commerce and places reliance upon the case of *Stockton* v. *Baltimore and New York Railroad Co., supra*. That was a case involving the right of a railroad company to construct and maintain a bridge across the Arthur Kill from the State of New Jersey to Richmond county, Staten Island, New York. The attorney-general of New Jersey filed an information in this court against the railroad company, praying for an injunction to restrain the erection of the bridge upon the lands of the state situate on the shore and under the waters of the Kill. The chancellor granted a preliminary injunction and the defendants removed the case, as one arising under the constitution and laws of the United States, to the circuit court of the United States for the district of New Jersey, and filed an answer and moved to dissolve the injunction, which application was granted. The grounds of the information were that the state was owner of the shore and land under the water of all navigable streams and arms of the sea within its border in fee-simple absolute, and that at the place of location of the proposed bridge its ownership extended from ordinary high-water mark to the centre line of the sound, being the boundary line between New Jersey and New York; and Mr. Justice Bradley, speaking for the judges of the circuit court (at *p. 20*), said:

"We think that the power to regulate commerce between the states extends, not only to the control of the navigable waters of the country and the lands under them for the purposes of navigation, but for the purpose of erecting piers, bridges and all other instrumentalities of commerce which, in the judgment of congress, may be necessary or expedient.

"Entertaining these views with regard to the power of congress among the several states, including that of the navigable waters of the country and the lands under the same as subsidiary to that end, we have no hesitation in declaring our opinion to be that the authority given by the act of June 16th, 1886, to build the bridge in question, and, for that purpose, to erect the

necessary piers of such bridge upon the lands under the water of Arthur Kill, is valid and constitutional, and does not injuriously affect any property or other rights of the State of New Jersey."

Now, it is to be observed that the act under consideration in *Stockton* v. *Baltimore and New York Railroad Co.* was one making it lawful for the Staten Island Rapid Transit Company and the Baltimore and New York Railroad Company, or either of them, to build and maintain a bridge across the Staten Island sound or Arthur Kill from New Jersey to New York for the passage of railroad trains, with provisions against obstruction of navigation. The structure was intended to facilitate interstate commerce, although it was not so expressly stated in the act.

Whether the land of the state, assuming that congress could authorize its taking without the consent of the state, could be taken without compensation made, was a question adverted to but left undecided in the opinion.

Quite different from the act considered and construed in *Stockton* v. *Baltimore and New York Railroad Co.* is that under which the Water Company claims in the case at bar. The act with which we are here concerned is known as the River and Harbor act of March 3d, 1899, and is entitled "An act making appropriations for the construction, repair and preservation of certain public works on rivers and harbors, and for other purposes." Section 1 makes appropriations for the improvement of various rivers and harbors; 2 concerns preliminary surveys; 3, 4, 5 and 6 concern the Isthmian canal; 7 and 8 require certain reports from the chief of engineers of the United States army; 9 authorizes the construction of bridges over navigable waters; 10 provides against obstruction to the navigable capacity of any of the waters of the United States; 11 provides for the establishment of harbor lines; 12 provides that any person or corporation who shall violate any of the provisions of 9, 10 and 11 shall be guilty of a misdemeanor and on conviction be punished by a fine or imprisonment in the case of natural persons, and provides that the removal of any structure erected in violation of the provisions of those sections may be enforced by injunction of any circuit court exercising jurisdiction in

any district in which such structures may exist, proceedings to be instituted under the direction of the attorney-general of the United States; 13 makes it unlawful to deposit refuse in navigable waters, provided that whenever, in the judgment of the chief of engineers, anchorage and navigation will not be injured thereby, the deposit of certain material within defined limits and under prescribed conditions may be made; 14 makes it unlawful to build, alter, destroy or injure any sea wall or other work built by the United States and used in connection with the preservation and improvement of any of its navigable waters; 15 makes it unlawful to anchor vessels in navigable channels in such manner as to prevent the passage of other vessels or craft; 16 prescribes penalties for the violation of 13, 14 and 15; 17 provides that the department of justice shall conduct the legal proceedings necessary to enforce the provisions of sections 9 to 16, inclusive; 18 provides that the secretary of war shall under certain conditions as to notice, &c., cause the alteration of any railroad or other bridge which is an unreasonable obstruction to free navigation; 19 provides for the removal of obstructions to navigation caused by sunken craft; 20 is to the same effect; 21 concerns advertisement for bids, and 22 directs certain preliminary surveys to be made.

Thus it will be seen that besides making appropriations for public works on rivers and harbors, the "other purposes" for which the bill was passed were the prevention of obstruction to navigation, the construction of bridges over navigable waters, and the providing of penalties for infractions of various sections of the act; which act has been construed strictly, because it is in derogation of common law rights.

*Willink* v. *United States, 38 Ct. Cl. 693,* was the prosecution of a claim for damages against the federal government for injury to the lands of a riparian owner on the Savannah river arising out of the doing of harbor work at Savannah. The construction of a prior river and harbor act was involved. Said the court of claims (at *p. 703*) :

"As to the act of 19th September, 1890, upon which these officers seem to have based their action, it is one of those statutes which, being against common right, is to be strictly construed

and which is to be interpreted and applied ·in accordance with the constitutional rights of individuals."

If the act is in derogation of common right and is to be strictly construed, it certainly does not give any right against a sovereign state ·except in respect to those things which are strictly within its purview.

United States Attorney-General Olney, in an opinion to the secretary of war, May 31st, 1893, answering the question whether it was the duty of the war department to serve a notice upon the State of Rhode Island under the River and Harbor act of 1890, looking to the removal of a bridge owned by it because it was found to be an obstruction to navigation, said:

"In my opinion the words 'persons, corporation or association,' in the statute do not include a sovereign state." *20 Op. Atty. Gen. 606*.

A case of strict construction, it will be observed.

United States Attorney-General John .W. Griggs, in an opinion to the secretary of war, February 10th, 1899 (*22 Op. Atty. Gen. 332*), concerning the construction of section 7 of the act of July 13th, 1892 (*27 Stat. at L. 88*), which section originally formed part of the River and Harbor act of 1890, said that the section consisted of three distinct affirmative clauses, followed by a proviso in the nature of a limitation, which embraced two separate clauses, which for convenience he analyzed, and which are here more shortly analyzed, as follows:

(a) It shall not be lawful to build any wharf, pier, &c., outside established harbor lines, &c., without permission of the secretary of war, &c.; (b) it shall not be lawful to commence the construction of any bridge, piers, &c., in any navigable waters, &c., until the location and plan have been approved by the secretary of war; (c) or to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of any port, roadstead, haven, harbor, harbor of refuge, or enclosure within the limits of any breakwater, or of the channel of any navigable waters of the United States, unless approved and authorized by the secretary of war; provided (1) that this section shall not apply to any bridge, &c., the construction of which has been heretofore authorized by law; (2) or be so construed

as to authorize the construction of any bridge, drawbridge, bridge piers and abutments, or other works under an act of the legislature of any state, over or in any stream, port, roadstead, haven, or harbor, or other navigable waters not wholly within the limits of such state; and he said (at *p. 337*) :

"It appears to me that the second paragraph of the section and both paragraphs of the proviso had in view this condition of the law (the fact that congress might give original authority for the erection of bridges when called for by the demands of interstate commerce, but in many cases had only given its assent to those erected under state authority), and this practice with reference to the subject of bridges and similar structures over navigable waters. It is not, in my judgment, intended by this act that plenary power should be conferred upon the secretary of war to authorize the construction of bridges and similar works over navigable waters of the United States, but to substitute a new method by which the assent of the United States should be required in all future cases, but without the necessity of a special act of congress in each case. It will be observed that the particular class of structures enumerated in the second clause of the section and in both the clauses of the proviso are substantially the same, namely, bridges, bridge-draws, bridge piers and abutments. The second clause of the section and the second clause of the proviso have the additional phrase 'or other works.' But under a well settled practice of statutory interpretation, these words are not to be used according to their natural and usual sense, but are restricted to things of the same kind as those just enumerated." *South. Stat. Con. 272.*

And (at *p. 339*) :

"It may have been anticipated by congress that a contention might arise * * * on this point, and * * * the second clause of the proviso was inserted as a precautionary measure. This was not a limitation upon the authority of the secretary of war, but a limitation upon the interpretation of the act. The proviso does not say that this section shall not be so construed as to authorize the secretary of war to authorize the construction of any bridge, but it reads 'this section shall not be so construed as to authorize the construction of any bridge,' &c.

The obvious purpose was to prevent the construction of bridges over such waters as were boundary waters, upon the mere authority of one of the riparian states. If the proper acts of authorization were passed by the legislatures of both states I do not think the secretary of war would be prohibited from approving the plan and location of a bridge across boundary waters."

And then he went on to say that the dredging of the canal, which was the subject of his inquiry, had been theretofore assented to and approved by the war department, and he saw no reason for withdrawing that consent whether it was a work over which the secretary of war had or had not any jurisdiction; that if it required his approval then it was properly given, and because the company had prosecuted its work in good faith and expended large sums of money it ought not to be revoked.

In the opinion just referred to the eminent attorney-general advised the secretary of war that, in his judgment, the act in question, which is similar to that under which the Water Company claims in this case, did not confer upon him, the secretary, power to authorize the construction of bridges and similar works over navigable waters, but simply provided the method by which the assent of the United States to the construction of such works over navigable waters should be had without the necessity of a special act of congress in each case. Look at the third clause of the section considered by the attorney-general. The provision is, that it shall not be lawful to excavate or fill or in any manner to alter or modify the course, location, condition or capacity of any port, roadstead, haven, harbor, harbor of refuge, or enclosure, within the limits of any breakwater, or of the channel of any navigable waters of the United States, unless approved and authorized by the secretary of war. Now look at the third clause of section 10 of the present act. It provides that it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of any port, roadstead, haven, harbor, canal, lake, harbor of refuge or enclosure within the limits of any breakwater, or of the channel of any navigable waters of the United States, unless the work has been recommended by the chief of engineers and authorized by the secretary of war prior to the beginning of

the same. The two provisions are identical in substance, and almost identical in language. The only differences are, that canals and lakes are included in terms in the act of 1899, and the authorization by the secretary of war to the doing of any such work is made to depend upon its being first recommended by the chief of engineers. The opinion of the learned attorney-general that by the act of July 13th, 1892, it was not intended that "plenary power should be conferred upon the secretary of war to authorize the construction of bridges and similar works over navigable waters of the United States," is just as applicable to the provisions of section 10 of the act of 1899; and if excavating in the bed of the Kill von Kull for the purpose of laying a pipe line in the trench can be said to be a work which may be authorized by the secretary of war upon proper recommendation by the chief of engineers, which may be conceded, still, it is an authorization which the secretary may effectively give, only in the event of the party asking it having the right under authority, state or national, to do the work. In other words, the work cannot be done without such authorization, no matter if plenary authority for the doing thereof, independently of the secretary's authorization, existed. Such work, namely, excavating, is in the same situation as the construction of bridges over navigable waters, and the language of the attorney-general, viz.: "Similar works over navigable waters," may well be interpreted to mean "works under navigable waters," and excavating in the Kill von Kull is certainly work under water.

Section 10 of the act of 1899 may be searched in vain for the discovery of any affirmative grant of right or power for the construction of any instrumentality of commerce. The section is entirely negative and prohibitive in character. It is intended to prevent obstruction to navigation, and that alone. As already seen, it is an act in derogation of common law rights and is to be strictly construed. To say that it is authority for the prosecution of a work or works in or under any of the navigable waters of the United States, unless those works have first been affirmatively authorized by proper authority, either state or federal, is, in my judgment, to give the section a meaning which is unsupported by any rule of construction known to the law.

The supreme court of the State of Illinois has decided that the authorization of work by the secretary of war is a mere license to do the work and not a grant of power to do it. That court held in *Cobb* v. *Lincoln Park, 202 Ill. 427* (at *p. 437*), as follows:

"Appellant also claims that by virtue of the license from the secretary of war he is entitled to build this wharf, because, as he says, a license from the executive officer of the government to build this wharf means permission and authority from the United States government to do so, and such permission and authority being granted neither the state nor any of its agents have any control over the subject-matter. He refers to the River and Harbor act of congress of September 19th, 1890 (*26 Stat. at L. ch. 907 p. 426*), as sanctioning his contention. Section 7 of this act was superseded by sections 9 and 10 of the River and Harbor act of March 3d, 1899. *30 Slat. at L. ch. 425 pp. 1121, 1151.* Section 10 of the latter act is as follows: ' * * * These provisions of the law were designed to protect the navigable waters of the United States from encroachment and from obstructions to navigation and commit the duty of their protection to an officer of the general government, without whose permission no structures can be erected in them.'

"It is conceded that the power of congress over the navigable waters of the country is derived from the commerce clause in the constitution of the United States, and that it is exclusive and paramount whenever congress has definitely spoken on any subject under its jurisdiction. It has been held by the federal courts that when congress has authorized the erection of a bridge it is not necessary to obtain the consent of the state authorities for its erection, and that no compensation need be made to the state for the use of its property in the lands under water (*Stockton* v. *Baltimore and New York Railroad Co., supra*), and that an individual has no claim for compensation when the general government erects piers on his submerged lands in aid of navigation and thus cuts off his access to the water. *Scranton* v. *Wheeler, 179 U. S. 141.* But, however that may be, we are of the opinion that the act prohibiting the erection of wharves without the consent of the secretary of war is a mere regulation

for the benefit of commerce and navigation, and that the license or permission of the secretary of war is only a finding and declaration of such officer that such proposed structure would not interfere with or be detrimental to navigation, and not that it is equivalent to a positive declaration by the authority of congress that the licensee may build the wharf or other structure without first obtaining the consent of the owner of the submerged land on which it is his purpose to build. Appellant not having, by the law of this state, the right to construct a wharf over his neighbor's submerged lands without his neighbor's consent, could not acquire that right without his neighbor's consent by obtaining a license from the secretary of war.

"We are further strengthened in this view by section 11 of the act of congress of 1899 (a substantial re-enactment of section 12 of the act of 1890), which authorizes the secretary of war to establish harbor lines beyond which no piers, wharves, bulkheads or other works shall be extended except under such regulations as may be prescribed from time to time by him. When harbor lines are established no permit or license from the secretary of war is necessary to build a wharf not extending beyond such lines. It certainly cannot be said that, because the statute does not make a license necessary in such a case, a riparian owner can build his wharf within the harbor lines in a state where the right to wharf out is not recognized, without the consent of the owner of the submerged land. The fixing of harbor lines is only a finding by an officer of the government that erections within such lines will not injure or interfere with navigation. If parties choose to build within such harbor lines the general government will not interfere. It is not a declaration touching the rights of the owners of the submerged lands in the harbor. When harbor lines are not established, or beyond established harbor lines, the permission of the general government to build a wharf in navigable waters is necessary. But such permission is not given to override the rights of the owners of the submerged lands. It is, as said above, a declaration by the guardian of the interests of the public at large that the proposed structure will not interfere with navigation. It is strictly

permissive, and not an authorization by paramount authority to build the structure."

The doctrine of *Cobb* v. *Lincoln Park*, as applicable to the case under consideration, may be paraphrased as follows: The provisions of section 10 of the River and Harbor act of March 3d, 1899, were designed to protect the navigable waters of the United States (including the Kill von Kull) from encroachment and from obstructions to navigation, and to commit the duty of their protection to an officer of the general government without whose permission no such obstructions can be made; that the act is a mere regulation for the benefit of commerce and navigation and that the license or permission of the secretary of war is only a finding and declaration that a proposed structure or excavation would not interfere with or be detrimental to navigation, and is not equivalent to a positive declaration by the authority of congress that the licensee may make such obstruction or excavation without first obtaining the consent of the owner of the submerged land; that the Water Company, not having by the law of this state the right to excavate on the submerged lands without the state's consent, could not acquire that right by obtaining a license from the secretary of war; that the act is not a declaration touching the rights of the owner of the submerged lands in question, and, assuming that the permission of the general government to the excavation and laying of the proposed pipe line is necessary, such permission is not given to override the rights of the owner of the submerged lands, namely, the State of New Jersey; and it is, as said, the declaration by the guardian of the interests of the public at large that the proposed work will not interfere with navigation, and is strictly permissive, and not an authorization by paramount authority to do the work proposed. Thus it appears that the cases, in principle, are parallel.

The Water Company contends for the right to lay its pipe line across the Kill von Kull in lands under water belonging to this state because it alleges that it is engaged in interstate commerce, which may be conceded (*Kansas City Natural Gas Co.* v. *Haskell, 172 Fed. Rep. 545*), and relies upon the language of Mr. Justice Bradley, speaking for the circuit court in *Stockton*

v. *Baltimore and New York Railroad Co., 82 Fed. Rep.* (at *p. 20*), where he says:

"We think that the power to regulate commerce between the states extends not only to the control of the navigable waters of the country and the lands under them, for the purpose of navigation, but for the purpose of erecting piers, bridges and all other instrumentalities of commerce, which, in the judgment of congress, may be necessary or expedient."

Conceding to this language all that is claimed for it, it is nevertheless perfectly apparent that nowhere in the tenth section of the River and Harbor act of 1899 is there any intention, expressed or implied, to grant to any person or corporation the right to lay a pipe line under navigable waters in lands belonging to a state or individual, for the purpose of transporting any merchantable commodity whatever. The only intention discoverable is, as already said, the authorization of such a work if it may be lawfully done, and the intention is to authorize it to be done only in such way as to prevent its being any obstruction to navigation. Congress may some day be induced to enact a law under the commerce clause of the federal constitution, which will make a grant of power such as is contended for by the Water Company in this case, but, up to the present time, it has not done so, and the Water Company, without a grant of power, is seeking to prosecute an unlawful work—a work not unlawful in and of itself, but unlawful so far as it appropriates the land and invades the rights of the State of New Jersey, and this by obtaining a mere license from a supervisory power—a license to do the thing desired, efficacious only if and when lawful authority to prosecute the work shall have been obtained.

In this connection it may be observed that the tenth section of the River and Harbor act does not provide that it shall be lawful for the secretary of war to authorize the excavation of land in the channel of any navigable waters of the United States, but only that it shall not be lawful to do the work without the authorization of the secretary, had before beginning the work. The section as worded clearly contemplates that the consent of the secretary shall merely be permissive of the doing of work for which authority already exists.

The force of this view of the situation was clearly seen by the able counsel of the Water Company, who says that it is perfectly clear that were there an act of congress authorizing the laying of the pipes no question could possibly exist of the inability of the State of New Jersey to interfere therewith, and he contends that the same thing is true of the consent of the secretary of war given pursuant to congressional authority, meaning, of course, the consent given under section 10 of the River and Harbor act of 1899. In support of this contention he cites *Cummings* v. *Chicago, 188 U. S. 410; Montgomery* v. *Portland, 190 U. S. 89; Corrigan Transit Co.* v. *Sanitary District of Chicago, 137 Fed. Rep. 851, 857; Maine Water Co.* v. *Knickerbocker Steam Towage Co., 59 Atl. Rep. 953; Lane* v. *Smith, 41 Atl. Rep. 18; Hagan* v. *Richmond, 52 S. E. Rep. 385; 21 Op. Atty. Gen. 41.*

*Cummings* v. *Chicago* was a case involving the question of the right to construct a dock in a navigable river wholly within the State of Illinois under the acts of congress and a permit from the secretary of war. Said Mr. Justice Harlan, speaking for the court (at *p. 428*) :

"That case (*Lake Shore & M. S. R. Co.* v. *Ohio, 165 U. S. 366, 368*) required a construction of the fifth and seventh sections of the River and Harbor act of September 19th, 1890, upon which sections the plaintiffs in this case partly rely. In that case this court said: 'The contention is that the statute in question manifests the purpose of congress to deprive the several states of all authority to control and regulate any and every structure over all navigable streams, although they be wholly situated within their territory. That full power resides in the states as to the erection of bridges and other works in navigable streams wholly within their jurisdiction, in the absence of the exercise by congress of authority to the contrary, is conclusively determined. * * * The mere delegation to the secretary of the right to determine whether a structure authorized by law has been so built as to impede commerce, and to direct, when reasonably necessary, its modification so as to remove such impediment, does not confer upon that officer power to give original authority to build bridges, nor does it presuppose that congress conceived that it was lodging in the secretary power to that end.

\* \* \* The mere delegation of power to direct a change in lawful structures so as to cause them not to interfere with commerce cannot be construed as conferring on the officer named the right to determine when and where a bridge may be built.' "

Clearly, then, *Cummings* v. *Chicago* is a declaration by the supreme court of the United States that the delegation to the secretary of war of the right to determine whether a structure, and, therefore, whether a work such as excavating, will impede commerce, that is to say navigation, does not confer upon that officer power to give original authority for the erection of the structure or the making of the excavation, but only power to consent to such work in the event that it will not interfere with navigation.

*Montgomery* v. *Portland, 190 U. S. 89,* was a case which involved the question whether the authority given the secretary of war under the River and Harbor act of 1890 was intended to supersede the power of the states to regulate the use of navigable waters entirely within their boundaries, and, largely, upon the authority of *Cummings* v. *Chicago,* it was decided that it did not. The case, as I view it, has no application to the case at bar.

*Corrigan Transit Co.* v. *Sanitary District of Chicago, 137 Fed. Rep. 851,* concerned rights claimed under a permission by the secretary of war under the River and Harbor bill of 1899, in waters wholly within the State of Illinois, and does not, in my judgment, touch the real question involved in the case at bar. The court, however, significantly remarked in the conclusion of its opinion (at *p. 857*) :

"With the commerce clause in abeyance, Illinois, as to every being in the world, except future congresses, was absolute sovereign in the premises. The absolute sovereign may change the grade of highways, or may vacate them, may alter the courses and currents of rivers, or may dam or fill them up, and neither alien nor subject traveler and navigator may complain. No one can claim a vested right to have the United States interfere with Illinois, nor can a cause of action arise from want of interference."

The commerce clause of the constitution of the United States

is in abeyance so far forth as enacting any law authorizing the laying of pipe lines under the navigable waters of the United States in aid of interstate commerce is concerned, and, although some future congress may pass such an act, until it does so the State of New Jersey may at least prevent the appropriation of any of its lands under the navigable waters of the United States by any person or corporation seeking to use such lands in furtherance of its business, although that business may be interstate commerce.

*Maine Water Co.* v. *Knickerbocker Steam Towage Co., 59 Atl. Rep. 953,* was an action for damages by a water company against a vessel whose anchor fouled and injured a pipe line upon a structure in the bed of the Kennebec river, upon a showing of negligence by the captain of the vessel. Permission to lay the pipes in the river, which was wholly within the State of Maine, was granted by the legislature of that state, upon plans submitted to the secretary of war and which were recommended by the chief of engineers and authorized by the secretary under section 10 of the act of 1899. The defendant contended that there was no act of congress affirmatively authorizing the laying of the pipe, and the court held that the language of section 10 should be construed to mean that such a work was affirmatively authorized by congress, by implication, when the plans were recommended by the chief of engineers and the work was authorized by the secretary of war; that is to say, that no special act of congress was necessary to authorize the particular work. No question was involved touching the right of congress, either generally or specifically, in terms or by implication, to create any right under section 10 of the act of 1899, which was not in itself entirely lawful and authorized irrespective of federal permission. If congress had passed a special act authorizing the construction of this particular pipe line across the bed of the Kennebec river, instead of authorizing generally such construction upon plans recommended by the chief of engineers and authorized by the secretary of war, the decision would have been the same, namely, that the structure, having the authority of the state and of the federal government, was lawful, and that its injury, through negligence at least, was unlawful and action-

able.   This was a structure in the bed of a navigable river wholly within a single state, and which, but for proper authority, would have been an unlawful obstruction to navigation.   No question of interstate navigable waters was involved, and the decision is no authority to the effect that because congress has the authority to legislate concerning interstate navigable waters, and that that legislation, when enacted, is paramount and exclusive, that, therefore, the permission obtained by the water company in this case from the secretary of war needs not to be supplemented by authority from the State of New Jersey.   The cases hold, as I understand them, that the power of congress over intra-state streams, when exercised to the full limit, is as paramount and exclusive as when exercised over interstate streams, so the question resolves itself in the last analysis into whether or not the substantive authority which must, I take it, underlie the mere permissive authority, has been obtained, whether state or federal, or exclusively federal.   Now, in the case just cited, both authorities were necessary, and both were obtained, and, in the case before me, in my judgment, both authorities are necessary, and only one, namely, the federal permissive authority, has been obtained; *ergo,* the Water Company is without adequate power and authority to prosecute the work in question.

It must be remembered that the pipe line in the above case was laid by permission and authority both of the state (Maine) and United States, and that no question of the extent of the federal·authority alone was involved.

What was decided in *Lane* v. *Smith, 41 Atl. Rep. 18,* is stated in the syllabus, which is as follows:

"The owner of an oyster bed on the tidewater flats, designated to him under the laws of the state, has no cause of action against those who injure it by digging, in a proper manner, a channel through it for the purpose of straightening and improving the harbor channel, the digging being with the approval of the secretary of war and the board of harbor commissioners, under permits from them."

The case is one of those concerning intra-state waters, and contains nothing which is apposite to the case at bar.,

*Hagan* v. *Richmond, 52 S. E. Rep. 385,* was a case in which the supreme court of appeals of Virginia held that section 19 of the River and Harbor, act of March 3d, 1899, authorizing the secretary of war to remove obstructions from navigable waters did not operate to prevent the State of Virginia removing such obstructions in cases where the secretary took no action. I can discover nothing in this case which makes for the Water Company upon the question under consideration in the case before me.

*21 Op. Atty. Gen. 41,* was an opinion by United States Attorney-General Olney. He considered three questions—*first,* whether certain rivers were navigable waters of the United States; *second,* had the secretary of war jurisdiction to grant permission to obstruct such rivers, and *third,* permission to obstruct such rivers having been given, could such permission be revoked under the existing circumstances of the case; and he advised the secretary that the rivers were navigable waters of the United States, that he could grant the permission asked, but that, as a certain company had gone forward and made contracts and spent large sums of money and otherwise materially altered its situation on the faith of the permit granted, that, under such circumstances, the secretary was not then at liberty to revoke the permit. In arriving at these conclusions, and, in the course of his opinion, the learned attorney-general, discussing the proviso about excavating or filling in any navigable water of the United States, as embodied in the seventh section of the act of September 19th, 1890, and which is now a part of section 10 of the act of 1899 (at *p. 42*), said:

"The main object of congress in the statute is clear. It intended that the navigable waters of the United States should thereafter be under the exclusive control of the United States; that for the future their navigability should be interfered with by bridges, dams or other obstructions only by express permission of the United States, granted through its agent, the secretary of war. That is the plain meaning and operation of the first clause of the amended section 7, already referred to. The same unmistakable purpose is manifested by that clause of section 7 which immediately precedes the proviso, and which de-

clares that it shall not be lawful hereafter to 'excavate or fill, or in any manner to alter or modify the course, location, condition or capacity of any port, roadstead, haven, harbor of refuge or inclosure within the limits of any breakwater or of the channel of any navigable water of the United States, unless approved and authorized by the secretary of war.' This clause and the first clause of the section cover the whole subject, the one applying to structures in navigable waters of the United States, the other to excavating, filling or other disturbance of such waters. As structures are not to be erected without the permission of the secretary of war, so any excavation, filling, &c., must be approved and authorized by him. Thus the determination of congress that, as a general proposition, the United States shall take and hold jurisdiction over its navigable waters, which should be complete and exclusive of all interference with them from any other quarter, is too plainly and industriously declared to admit of any real question."

There is nothing in these views, as I read them, which makes for the defendant's case. All that is stated by way of advice in the opinion of the able lawyer named is, that "as structures are not to be erected without the permission of the secretary of war, so any excavation, filling, &c., must be approved and authorized by him." Here is no declaration that congress vested in the secretary of war the right and power in and of himself, solely and only to authorize any such work to be done, but only that, authority existing, he might approve and authorize the doing of the work, the only object being, as before stated, that the secretary might and should see to it that navigation of the public waters were not obstructed. To this extent, undoubtedly, the jurisdiction of the United States over its navigable waters is now asserted, and that jurisdiction, to that extent, is exclusive and paramount. That means this: New Jersey may grant the right to build a bridge or lay a pipe line in the Kill von Kull, but without the permission and license of the federal authorities the work cannot be done.

It is contended on behalf of the Water Company that no preliminary injunction should issue because the defendant is not an out and out trespasser, but is proceeding under a claim of

right which should be determined only after full hearing and not upon preliminary application, because no irreparable injury is being done, and reliance is placed upon the following cases, among others: *Attorney-General* v. *Paterson, 9 N. J. Eq. (1 Stock.) 624; Stockton* v. *North Jersey Street Railway Co., 54 N. J. Eq. (9 Dick.) 263; Raritan Township* v. *Port Reading Railroad Co., 49 N. J. Eq. (4 Dick.) 11, 16.*

But this contention is answered by Vice-Chancellor Emery in the two cases of *Township of Franklin* v. *Nutley Water Co., 53 N. J. Eq. (8 Dick.) 601,* and *Grey* v. *Greenville and Hudson Railway Co., 59 N. J. Eq. (14 Dick.) 372.* In the latter case he said (at *p. 386*):

"Two important questions therefore remain to be considered—*first,* whether the attorney-general has the right to restrain the construction of the road without evidence of serious actual public injury, and *second,* whether a preliminary injunction should go. As to the first question the cases relating to the right of the attorney-general to intervene in the public interest, which are numerous, show that the distinction is between cases in which a public nuisance, by reason of interference with ordinary public travel, is the sole basis of complaint, and cases where the real injury on which the attorney-general's information is based is an illegal act on the part of a public company in excess of its powers, through which illegal act the public generally is affected.

"In cases of the first class, based on nuisance to travel or passage, it is settled that the attorney-general, in order to obtain the aid of a court of equity, must show a serious public injury, which cannot be remedied in the ordinary tribunals. *Raritan Township* v. *Port Reading R. R. Co., 49 N. J. Eq. (4 Dick.) 11,* and cases cited at *p. 18.*

"In cases of the latter class—excess of public powers affecting the public rights—the rule is settled by many authorities that the attorney-general is justified in interfering without evidence of actual injury to the public. In *Attorney-General* v. *Shrewsbury Bridge Co. (Mr. Justice Fry), 21 Ch. Div. 752,* all the previous English cases are examined, and this rule declared to be settled. And this case also shows that as to the nature of

the public interest to be protected, the interference with the public highways or the navigable waters of the state, by a public company in excess of its powers, is a sufficient public interest. This seems to me to be the true rule upon the question now involved. The protection of the state and the public rights against the illegal excess of powers is peculiarly under the charge of the attorney-general, and where this excess affects public rights in highways or navigable waters, the remedy of the state to control the excessive use of a power conferred for public use should not be confined to the uncertain and incomplete remedies by indictment or action after the injury has been completed. For the complete relief and protection to which the attorney-general, as representing the public rights in highways, is entitled, restraint against the excessive use of power is necessary. The uncertainty of protecting the public rights in highways by indictments against nuisances was one reason for the establishment of the doctrine that these public rights should also be protected by ejectment and by injunction, pursued by the municipal bodies vested with control of the highways. * * *

"As to the issuance of a preliminary injunction, such injunction is usually necessary in order to afford the complete relief to which the public are entitled, if, in fact, the interference with the highway is illegal, and preliminary injunctions seem to have been granted and approved in cases of this character where the right to ultimate equitable relief is clear upon the admitted facts. *Easton and Amboy Railroad Co.* v. *Greenwich Township, supra.* In cases involving the protection of private rights and municipal rights against excessive use of power by public companies, a preliminary injunction is always granted, where necessary for the complete protection to which they are entitled on undisputed facts. *Township of Franklin* v. *Nutley Water Co., supra,* and cases cited at *p. 606.* The public rights now asserted against the same kind of injury are entitled to the same protection, and the information does not come within the rule equally well established and enforced, where the rights to be protected and injury complained of involve private property or rights only, that irreparable injury must be shown in order to award a preliminary injunction."

This case (*Grey* v. *Greenville and Hudson Railway Co.*) was expressly affirmed on this point, but reversed on other grounds. See *Greenville and Hudson Railway Co.* v. *Grey, Attorney-General, 62 N. J. Eq. (17 Dick.) 768, 772.* See, also, *McCarter* v. *Pitman, Glassboro and Clayton Gas Co., 74 N. J. Eq. (4 Buch.) 255; State Board of Health* v. *Diamond Mills Paper Co., 63 N. J. Eq. (18 Dick.) 111, 116.*

There were several other questions raised and discussed with ability by the distinguished counsel who argued this application before me, but, deeming them of no controlling importance, I have refrained from considering them in this opinion, which has already run into too great length.

The views above expressed lead inevitably to the conclusion that the order to show cause should be made absolute and a preliminary injunction issued in accordance with the prayer of the information. The matter has been sharply litigated, and the informant is entitled to costs.