## DECKER *v.* BALTIMORE & N. Y. R. Co. and others.

*(Circuit Court, S. D. New York. 1887.)*

CONSTITUTIONAL LAW—INTERSTATE COMMERCE—NAVIGABLE WATERS—OBSTRUCTION.

Congress can lawfully confer upon a private corporation the capacity to occupy navigable waters within a state, and appropriate the soil under them, upon acquiring the rights of the owners, in order to construct a bridge over such waters for the purposes of interstate commerce, without the consent and notwithstanding the protest of the state.

In Equity. Bill for injunction.
*P. B. McLennan*, for complainant.
*W. W. MacFarland*, for defendants.

WALLACE, J. The complainant is a vessel owner whose business of transportation makes it necessary for him to use the narrow navigable water-way known as Arthur kill, which constitutes one of the boundaries between the states of New York and New Jersey. He has brought this suit to restrain the defendants from constructing a railroad bridge across these navigable waters, which they propose to build and maintain under claim of authority conferred by the act of congress of June 16, 1886, entitled "An act to authorize the construction of a bridge across the Staten Island Sound, known as Arthur kill, and to establish the same as a post road." The case is now here upon the defendants' demurrer to the bill of complaint, and upon complainant's motion for an injunction *pendente lite*.

It is not disputed that the complainant has a sufficient standing in a court of equity to challenge the right of the defendants to build the bridge; and the single question to be decided is whether they have a legal right to build the bridge. If they have, it is solely by the efficacy of the act of congress as a constitutional exercise of the power to regulate commerce between the several states. The legislature of New Jersey, by an act passed April 6, 1886, has forbidden the erection of any bridge or structure over any part of the navigable waters where the tide ebbs and flows, separating the state from other states, without express permission given by the legislature by statute in that behalf. The act was passed after the bill had been introduced in congress authorizing the construction of

this bridge, and before it became a law, and was preceded by the adoption of concurrent resolutions of the senate and house of assembly of New Jersey protesting against any action on the part of congress intended to legalize the erection of such a bridge.

The case thus presents the constitutional question whether congress can lawfully confer upon a private corporation the capacity to occupy navigable waters within a state, and appropria te the soil under them, for the purposes of interstate commerce, without the consent of the state.

Although the act of congress establishesthe bridge, when constructed, as a post road, this is wholly an incidental and an unnecessary feature of the legislation. The act does not purport to authorize the bridge in order to provide an additional post road; and the provision establishing the bridge as a post road, when built, was unnecessary, because it would become such by force of pre-existing law. Section 3964, Rev. St. U. S. Neither does it in terms purport to be an exercise of the power to regulate commerce between the states; but that this is its essential character is apparent from the recitals which show that it was designed to afford a connection between railroads already constructed, or to be constructed, on opposite sides of the sound. Obviously, congress intended to plant the rights conferred on the defendants upon the validity of the act as a regulation of commerce.

Both the language and the history of the act preclude the doubt whether it can be construed as intended to grant a privilege which is to become operative when concurrent authority to build the bridge is obtained from the states of New Jersey and New York. It is silent as to any such condition, and this silence is emphatic, in view of the provisions contemplating the assent of the state which have been inserted in all previous acts of a similar character when permission by the state had not been given in advance. As it was passed notwithstanding the protest of New Jersey, which was in effect a declaration that she would not consent, it must be assumed that congress did not regard the consent of the state necessary.

The precise question to be decided has never been adjudicated, and the present act is the first attempt on the part of congress to grant such a right as is asserted by the defendants.

In the language of the supreme court of the United States in *Miller* v. *Mayor of New York:*

"The power vested in congress to regulate commerce with foreign nations, and among the several states, includes the control of the navigable waters of the United States so far as may be necessary to insure their free navigation; and by navigable waters of the United States are meant such as are navigable in fact, and which, by themselves, or by their connection with other waters, form a continuous channel for commerce with foreign countries or among the states." 109 U. S. 395.

Whether the waters are wholly within the boundaries of a state, or, as here, lie between two states, is not material. They are navigable waters of the United States, if they form by themselves, or by uniting with others, a continuous highway for commerce with other states or

countries. *The Daniel Ball*, 10 Wall. 557; *Escanaba Co.* v. *Chicago*, 107 U. S. 682, 2 Sup. Ct. Rep. 185.

The power of control over such waters necessarily includes the power of deciding what structures are impediments to commerce; and, by an unbroken line of decisions, it is settled that the paramount authority regulating bridges that affect the navigation of the navigable waters of the United States is in congress.

So long as this authority lies dormant, the states may authorize the erection of bridges over navigable waters within their limits, which may to some extent obstruct navigation, or, by concurrent action, may bridge the waters lying between them; but, so soon as congress intervenes and exercises its power of regulation, what has been done by state authority must give way to the paramount authority of congress. The power of the state ends where that of the nation begins. *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 250; *Wheeling Bridge Case*, 18 How. 421; *Gilman* v. *City of Philadelphia*, 3 Wall. 728; *County of Mobile* v. *Kimball*, 102 U. S. 691; *Pound* v. *Turck*, 95 U. S. 459.

These decisions, however, fall short of adjudicating the present case, because they do not decide in terms that the power of regulation extends further than is required to preserve the free and unobstructed navigation of the public waters. If the power ends there, the present act is nugatory. That it does end there never has been authoritatively determined.

The lands under the water on the New Jersey side of Arthur kill belong to the state of New Jersey, or to those who have derived title from the state. The shores of navigable waters, and the soil under them, were not granted by the constitution to the United States, but were reserved to the states respectively. *Pollard* v. *Hagan*, 3 How. 212. The right of eminent domain over such lands, for all municipal purposes, resides in the state within the boundaries of which they lie, and within the legitimate limitations of this right the power of the state to appropriate the shores of navigable waters, and the lands under them, is absolute. *Ormerod* v. *New York, W. S. & B. R. Co.*, 21 Blatchf. 106, 13 Fed. Rep. 370. Expressions of opinions by learned jurists are found in several adjudged cases to the effect that congress cannot, under the power of regulating commerce, authorize the erection of bridges over navigable waters without the consent of the state, or sanction an obstruction of commerce.

In *People* v. *Rensselaer & S. R. Co.*, 15 Wend. 113, Chief Justice SAVAGE, after asserting that the power to erect bridges over such waters existed in the state legislature before the adoption of the federal constitution, says:

"It is not pretended that such power has been delegated to the general government as is conveyed under the power to regulate commerce and navigation. It remains, then, in the state legislature, or it exists nowhere. It does exist because it has not been surrendered any further than such surrender may be qualifiedly implied; that is, the power to erect bridges over navigable streams must be considered so far surrendered as may be necessary for a free navigation upon those streams."

In *People* v. *Kelly*, 76 N. Y. 475, EARL, J., states:

"The East river is a public navigable water, and to bridge it requires the concurrent authority of the state of New York and of the United States; of the former by reason of its rights in the lands on the shore, and under the water, and of its qualified sovereignty over the water; and of the latter by reason of the exclusive power of congress to regulate commerce, and to determine in its regulation thereof to what extent navigation upon the water may be obstructed or interfered with."

In the *Wheeling Bridge Case* Mr. Justice McLEAN, in considering whether congress could legalize a bridge over navigable water within the jurisdiction of any state or states, uses this language:

"But this does not necessarily include the power to construct bridges which may obstruct commerce, but can never increase its facilities on a navigable water. Any power which congress may have in regard to such a structure is indirect, and results from a commercial regulation. It may, under this power, declare that no bridge shall be built which shall be an obstruction to the use of a navigable water. And this, it would seem, is as far as the commercial power by congress can be exercised. * * * If, under the commercial power, congress may make bridges over navigable waters, it would be difficult to find any limitation of such a power. * * * So extravagant and absorbing a federal power as this has rarely, if ever, been claimed by any one."

In the more recent case of *Bridge Co.* v. *U. S.*, 105 U. S. 496, Mr. Justice FIELD uses this language:

"From the use of the word 'assent' to the erection of a bridge over a navigable river, or the declaring of one already erected a lawful structure, the transition has been easy and natural to the assumption of an affirmative power in congress to authorize, independently of the action of the states, the construction of such bridges, and to control them. From the authorities cited, and the reasons assigned, it is evident that congress possesses no such power. * * * If weight is to be given to these authorities, and to the reasons on which they rest, it must follow that the sovereignty and jurisdiction of the state over their navigable waters, which were as absolute upon the adoption of the constitution as over their roads, still continue; except that they are to be so exercised as not to obstruct the free navigation of the waters, so far as such navigation may be required in the prosecution of interstate and foreign commerce."

It is to be remarked, however, of these observations, that what was said by Mr. Chief Justice SAVAGE in the first case, and by Mr. Justice EARL in the second, was *obiter*, and that the views expressed by Mr. Justice McLEAN and by Mr. Justice FIELD were by way of argument in dissenting from the opinion of the court. It was not necessary in either of those cases to pass upon the point suggested.

The case of *South Carolina* v. *Georgia*, 93 U. S. 4, is an authority the other way. The supreme court there considered a case in which a bill was filed by the state of South Carolina against the secretary of war and other officers of the United States, to restrain them from obstructing or interrupting the navigation of the Savannah river under authority of an appropriation act of congress for the improvement of the harbor at Savannah. The court were of the opinion that the acts sought to be restrained did not tend to the destruction of the navigation of the river, although,

by obstructing the water-way of one of its channels, navigation would be restricted to the other channel, and therefore were not in any just or legal sense a destruction or impediment of navigation. The court held that the appropriation act conferred upon the secretary of war the discretion to determine the mode of improvement, and authorized the diversion of the water from one channel into another, if, in his judgment, such was the best mode. Mr. Justice STRONG, speaking for the court, used this language:

"It is not, however, to be conceded that congress has no power to order obstructions to be placed in the navigable waters of the United States, either to assist navigation, or to change its direction by forcing it into one channel of a river rather than the other. It may build light-houses in the bed of the stream. It may construct jetties. It may require all navigators to pass along a prescribed channel, and may close any other channel for their passage. If, as we have said, the United States have succeeded to the power and rights of the several states, so far as control over interstate and foreign commerce is concerned, this is not to be doubted."

And the *Wheeling Bridge Case* was cited as ruling that the power of congress to regulate commerce includes the power to determine what shall or shall not be deemed, in the judgment of law, an obstruction of navigation. This decision controls the present case. The state of South Carolina had not consented to the closing of one of the channels of her river by the authorities of the United States, and insisting that this could not be done against her consent, had asserted her rights to prevent it by a bill in equity. The question was necessarily involved whether, under the power to regulate commerce, congress can close the channel of a river within a state against the consent of the state. The decision puts that question at rest, and is an unqualified affirmation that congress can do so. If congress can close a river, it can certainly bridge one. Applying the principle of that decision here, where, instead of a jetty or a light-house, a bridge is the structure authorized, it follows that what congress has sanctioned by the present act is not an obstruction of navigation, that the judgment of congress concludes controversy as to the fact, and that concurrent action on the part of New Jersey is not only not indispensable, but that her opposition is futile.

The argument that the rights of the state of New Jersey are ignored or invaded by permitting such a bridge to be built without her consent is purely a sentimental one. She has no control of the water-way for the purposes of navigation which is not subordinate to the will of congress. She can make no use of it against the will of congress. The act of congress does not attempt to appropriate any of the property of her citizens, or to interfere with her power of eminent domain.

If the constitutional power of congress over the navigable waters of the United States is confined to a mere negation of state authority over them, if congress can only ratify and prohibit what the state proposes, if it has no faculty of independent action, and no vigor to originate, then, instead of being paramount, the power is practically subordinate to the power of the state. Yet it has never been doubted that, within the scope of its powers, the government of the United States is supreme, or that its

authority, when asserted, is, to the extent asserted, of necessity exclusive.

The constitution delegates to congress the power to prescribe the conditions upon which commerce in all its forms shall be conducted between the citizens of the several states, and to adopt measures to promote its development and prosperity. Bridges over navigable waters are necessary to facilitate transportation and commercial intercourse. They are well-recognized instrumentalities of commerce. The power to build them, or authorize them to be built, is an incident of the general power to regulate interstate commerce. If the national and state authorities disagree as to the expediency of bridging a river, and if, as is asserted, the power to act is partitioned between them, and can only be exercised concurrently, interstate commerce may be crippled. If congress deems a railroad bridge necessary or useful as an instrumentality of interstate commerce, there is no sound reason, aside from considerations of expediency, why it should not build one, or authorize a private corporation to do so. It seems idle to say that its power only extends to prohibiting the states from building such bridges, and that it can direct what bridges shall not be built, but not what shall be built. This would make the constitutional prerogative obstructive merely. Thus circumscribed, it would be shorn of most of its value.

It is not intended to intimate that congress can authorize the appropriation of private property for the purposes of such a bridge. It was at one time doubtful whether the government of the United States, in order to obtain property required for its own purposes, could exercise the right of eminent domain within the states. That question was settled in *Kohl v. U. S.*, 91 U. S. 367, where it was held that the government, if such property cannot be obtained by purchase, may appropriate it upon making just compensation to the owner. It is not necessary to consider whether congress could enable the defendants to condemn property in New Jersey for the purposes of their bridge. This has not been attempted by the act under consideration. All that is now necessary to decide is that, if the defendants acquire the right of the owners of the land under the waters and on the shores, the act of congress gives them lawful authority to build and maintain their bridge without the consent of the state of New Jersey.

The demurrer is sustained, and the motion for an injunction is denied.