## HUBBARD et al. v. FORT et al.

(Circuit Court, D. New Jersey. August 2, 1911.)

1. NAVIGABLE WATERS (§ 2*)—PIPE LINE CROSSING—CONSENT OF STATE.

Where a navigable stream forms the boundary line between two states, state consent to the crossing of the stream with a pipe line laid under the bed to be used in interstate commerce is not necessary if authority has been obtained from Congress.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 2, 63; Dec. Dig. § 2.*]

2. NAVIGABLE WATERS (§ 19*)—CROSSING STREAM—PERMIT BY SECRETARY OF WAR—EFFECT.

Act Cong. March 3, 1899, c. 425, § 10, 30 Stat. 1151 (U. S. Comp. St. 1901, p. 3541), prohibits the creation of any obstruction to the navigable capacity of any waters in the United States unless affirmatively authorized by Congress, and declares that it shall be unlawful to build any structure in a navigable water in the United States except on plans recommended by the chief of engineers and authorized by the Secretary of War; that it shall not be lawful to excavate or fill the channel of any navigable water in the United States unless such work is recommended by such engineer and authorized by the Secretary of War prior to beginning the same. Held, that a license executed by the Secretary of War under such section authorizing a corporation to carry water pipe lines under a navigable stream separating two states was a mere finding and declaration that the pipes, structure, or excavation would not interfere with or be detrimental to navigation, and was not equivalent to a positive declaration by authority of Congress that the licensee might make such obstruction or excavation without first obtaining authority from the state.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 59–72; Dec. Dig. § 19.*]

3. NAVIGABLE WATERS (§ 2*)—OBSTRUCTIONS—CONTROL—STATUTES.

Act Cong. Sept. 19, 1890, c. 907, §§ 7, 10, 26 Stat. 454, and Act March 3, 1899, c. 425, § 9, 30 Stat. 1151 (U. S. Comp. St. 1901, p. 3540), relating to the obstruction of navigable waters, and providing for the construction of wharves, dams, weirs, bridges, etc., are not limited to waters wholly within a state, but apply to interstate waters as well.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 2, 63; Dec. Dig. § 2.*]

4. NAVIGABLE WATERS (§ 19*)—OBSTRUCTION—STATUTES—CONSTRUCTION—"AFFIRMATIVELY AUTHORIZED."

Act Cong. March 3, 1899, c. 425, § 10, 30 Stat. 1151 (U. S. Comp. St. 1901, p. 3541), regulating the obstruction of navigable waters, provides that the creation of any obstruction not "affirmatively authorized by Congress" to the navigable capacity of any waters in respect of which the United States has jurisdiction is prohibited, and then declares that the building of certain structures and the performing of certain work with reference to navigable waters are forbidden without authority of the Secretary of War. Held, that the word "affirmatively" was used to distinguish the two kinds of authority referred to, and that the section should be construed to require that the initial authorization to create an obstruction must rest on affirmative congressional authority, and not on a mere permit of the Secretary of War.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 59–72; Dec. Dig. § 19.*

For other definitions, see Words and Phrases, vol. 1, p. 249.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5. NAVIGABLE WATERS (§ 1*)—"NAVIGABLE CAPACITY."**

A stream has "navigable capacity" when it is capable of being navigated over any part of the waters in their normal condition.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 5–16; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 5, pp. 4675–4684; vol. 8, p. 7728.]

**6. NAVIGABLE WATERS (§ 19*)—"OBSTRUCTION"—STATUTES.**

Act Cong. March 3, 1899, c. 425, § 9, 30 Stat. 1151 (U. S. Comp. St. 1901, p. 3540), relating to the obstruction of navigable streams, declares that it shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States, unless the consent of Congress to such structures shall have been obtained, and until the plans for the same shall have been approved by the chief of engineers and the Secretary of War, with certain provisos. Section 10 prohibits the creation of any obstruction, not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States. *Held,* that section 10 not only includes the kind of structures specifically referred to in section 9, but all others that may be an obstruction to the navigable capacity of the waters of the United States, without reference to whether the obstruction is but slight, and only temporary.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 59–72; Dec. Dig. § 19.*

For other definitions, see Words and Phrases, vol. 6, pp. 4890–4894.]

**7. NAVIGABLE WATERS (§ 19*)—OBSTRUCTIONS—"AUTHORIZE."**

Act Cong. March 3, 1899, c. 425, § 10, 30 Stat. 1151 (U. S. Comp. St. 1901, p. 3541), provides that the creation of any obstruction not affirmatively authorized by Congress to the navigable capacity of the waters of the United States is prohibited, except on plans recommended by the chief of engineers and authorized by the Secretary of War. *Held,* that the word "authorize" was used in such section in the sense of to approve of and formally sanction, and did not confer on the Secretary of War authority to grant original authorization for the construction of any work constituting an obstruction of the navigable waters of the United States.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 59–72; Dec. Dig. § 19.*

For other definitions, see Words and Phrases, vol. 1, pp. 646–648.]

In Equity. Bill by Harry Hubbard and another, as receivers of the Hudson County Water Company, against John Franklin Fort and others. Dismissed on demurrer.

McCarter & English and Bennett Van Syckel, for complainants.
Edmund Wilson, Atty. Gen., for defendants.

RELLSTAB, District Judge. The bill is filed by the receivers of the Hudson County Water Company, a New Jersey corporation (hereinafter called the Water Company), and attacks the constitutionality of certain acts of the New Jersey Legislature, and seeks to have the defendants, certain state officers, enjoined from enforcing such acts, and from interfering with complainants in carrying out certain contracts and engaging in interstate commerce in water.

The bill, so far as is necessary for present consideration, alleges, in

substance: The incorporation of such Water Company by the state of New Jersey, the appointment of complainants as receivers with power to institute suits for the protection and enforcement of the lawful rights and contracts of such Water Company. That among the objects stated in such Water Company's certificate of incorporation were "the acquisition of water from either surface or subterranean sources or by purchase and the storage, sale, and delivery of the same; the acquisition, construction, operation, and sale of waterworks and reservoirs, wells, pipe lines, and all other property, real and personal, pertaining to the collection, sale and distribution of water," the making of contracts by the Water Company with the city of New York to supply subterranean water for use and consumption on Staten Island in the state of New York. That Staten Island is separated from the state of New Jersey by a navigable tidewater stream known as Kill von Kull. That the boundary line between the state of New York and the state of New Jersey is located in the center of said Kill. That the Water Company acquired lands in New Jersey, sunk wells therein, and under municipal authority laid pipe lines therefrom to such stream, with the purpose of laying pipe lines in the bed of such stream to conduct the water from such wells to said island, to carry out its said contracts; that by grant contained in an ordinance of the city of Bayonne the Water Company holds the right to lay water pipes "southerly through Ingham avenue, and under the property of the city at the foot of said Ingham avenue, to the southerly boundary line of said city, being the center of the said Kill von Kull * * * and that by grant made by the J. M. Guffey Petroleum Company to the Water Company * * * said Water Company purchased from the Petroleum Company a right of way to lay, maintain, and operate its pipes upon a strip of land twenty feet in width on the easterly side of Ingham avenue, and succeeded thereunder to the rights of the Petroleum Company, as owner of the upland and as grantee of the lands under water by grant from the riparian board of the state of New Jersey." That all of said constructions and contracts are interstate commerce. That the Water Company obtained from the Secretary of War of the United States, under section 10 of the act of Congress approved March 3, 1899 (Act March 3, 1899, c. 425, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3541]), known as the "River and Harbor Bill," authority to lay its pipes in the bed of said stream, the following being a copy of such authority:

"War Department, Washington.
"November 17, 1909.

"45716 Engs.

"Sir: In answer to your application of the 4th instant, permission, revocable at will by the Secretary of War, is hereby granted the Hudson County Water Company (successor to the Richmond Water Company), its successors or assigns, in accordance with the recommendation of the Chief of Engineers, U. S. Army, to lay, maintain and operate two water mains across the Kill von Kull, from Bayonne, N. J., to Staten Island, N. Y., as shown on map attached hereto, subject to the following conditions:

"(1) That if at any time in the future it shall be made to appear to the Secretary of War that the structures herein authorized are unreasonable obstructions to the free navigation of said waters, said licensee will be re-

quired, upon notice from the Secretary of War, to remove or alter the same so as to render navigation through said waters reasonably free, easy, and unobstructed.

"(2) That the highest part of said pipes shall be at least thirty (30) feet below the plane of mean low water.

"(3) This permit is given in lieu of instrument dated December 9, 1904, authorizing the Richmond Water Company to lay two water mains across the Kill von Kull from Bayonne, N. J., to Staten Island, N. Y., at the location shown on plans attached to said instrument, which is hereby revoked.

"(4) That the work herein permitted to be done shall be subject to the supervision and approval of the local officer of the Corps of Engineers, U. S. Army, whose address is Army Building, New York City.

"Very respectfully,

"Robert Shaw Oliver, Assistant Secretary of War.

"Mr. T. A. Beall, President.

"Hudson County Water Company.

"100 Broadway. New York City.

"(Map 45716–28 Engs. hereto attached.)"

That by virtue of said authority "and of other grants hereinbefore set forth the said Water Company was authorized and possesses the full right to lay and maintain said pipes in the bed of said Kill von Kull. That by virtue of the authority bestowed by the United States Constitution upon Congress to regulate commerce between the states the Congress of the United States was authorized to enact section 10 of the act of March 3, 1899, above (hereafter) quoted, and the Secretary of War, upon the recommendation of the chief of engineers, was likewise authorized and empowered to give the licenses above mentioned, and that said Water Company, after securing such licenses, was justified in having dredging done in the bed of said Kill von Kull for the purpose of laying therein the said pipes as aforesaid, without the sanction or permission and in spite of the objection of the state of New Jersey, and that there was expended by the Water Company and its contractors a sum in excess of thirty thousand ($30,000) dollars in such work and dredging, extending over a period of about six months, before any interference or objection thereto by the state of New Jersey or any official thereof." That such work in the bed of said stream was forcibly stopped by defendants acting under the following state enactments:

"An act to prevent the diversion of well, subsurface, or percolating waters of this state by means of pipes, conduits, ditches or canals into other states for use therein.

"Be it enacted by the Senate and General Assembly of the State of New Jersey:

"(1) It shall be unlawful for any person or corporation to transport or carry through pipes, conduits, ditches or canals any well, subsurface or percolating waters of this state into any other state for use therein.

"(2) This act to take effect immediately.

"Approved April 7, 1910." Laws 1910, c. 98.

"A supplement to an act entitled, 'An act to ascertain the rights of the state and of the riparian owners in the lands lying under the waters of the Bay of New York and elsewhere in the state,' approved April eleventh, one thousand eight hundred and sixty-four.

"Be it enacted by the Senate and General Assembly of the State of New Jersey:

"(1) It shall be unlawful for any person or corporation to lay any pipe or pipes on any of the lands of the state lying under tidal waters without the

consent or permission of the Governor and the Board of Riparian Commissioners of this state first had and obtained in writing; provided, that nothing in this act contained shall be construed to apply to lands under the waters of the Atlantic Ocean.

"(2) This act shall take effect immediately.

"Approved April 7, 1910." Laws 1910, c. 103.

That the defendants "have interfered with and prevented the construction and completion of said pipe lines which were to be used wholly and solely for the interstate carriage and transportation of subterranean water, and caused the construction of the same to be discontinued and the material therefore removed and the contractors of said Water Company to be driven from said work." That it is the avowed purpose of the defendants to prevent the transportation of subterranean water from the lands of the company beyond the limits of the state of New Jersey, to the destruction of the rights of said company under its contracts. That prior to the enactment of said state legislation such company was enjoined by the state Court of Chancery from prosecuting said work in crossing said stream upon the alleged insufficiency of the title of said company, and the insufficiency of the authority obtained from the War Department of the United States permitting the laying and operation of said pipe line. "That the subterranean water which the said Water Company and your orators as its receivers purpose to transport from the lands of said Water Company in the state of New Jersey to Staten Island is the property of and owned solely by the said Water Company, and that in said water the state of New Jersey has no right, title, or interest, nor any control thereof, and that the state of New Jersey cannot take and appropriate the same nor prohibit or prevent the use or sale thereof by the said Hudson County Water Company or your orators as receivers without the exercise of the right of eminent domain and compensation therefor, and that the so-called 'Laws' above referred to were really and solely designed for, and are now being used by the defendants for, the purpose of taking and destroying the property of the Water Company, without compensation, by preventing the use thereof."

The bill charges that said statutes of New Jersey, so far as they apply to the Water Company in the interstate carriage and piping of subterranean waters out of the state of New Jersey to Staten Island, are unconstitutional and void because they conflict with clause 3, § 8, art. 1, of the Constitution of the United States, granting to Congress the power to regulate commerce among the several states, in that they are an absolute inhibition upon the exportation of an article of commerce; that the state of New Jersey and the defendants have no "power, authority, dominion, control or jurisdiction over persons, firms or corporations engaged like said Water Company and your orators as receivers thereof, in the transportation and carriage of subterranean waters between states, such persons, firms or corporations so engaged, being wholly within the control, power, authority, jurisdiction and protection of the laws and Constitution and courts and government of the United States of America, and no other."

The grounds of demurrer are several; but from the conclusion I

have reached it will not be necessary to consider more than one, viz., that the permit of the Secretary of War to cross the Kill von Kull amounts to no authority, and that the state may forbid the crossing regardless of the permit. It is conceded that the state of New Jersey is the owner in fee of the lands in the Kill von Kull, in which the said Water Company intends to lay the said pipe lines, and that no grant or permit has been obtained by the Water 'Company from the state to excavate the bed of that stream, or to lay its pipe therein.

[1] No such permit is necessary, however, if authority has been obtained from the United States Congress to make such crossing. It is well-settled law that state authority is not necessary to cross a navigable stream between states with instrumentalities engaged in interstate commerce; that such crossing may be made by authority of the Congress in spite of the state's protest. Decker v. Baltimore & N. Y. R. R. (C. C.) 30 Fed. 723; Stockton v. Baltimore & N. Y. R. R. Co. (C. C.) 32 Fed. 9; United States v. Rio Grande Nav. Co., 174 U. S. 690–708, 19 Sup. Ct. 770, 43 L. Ed. 1136.

No act of Congress specifically authorizing the Water Company to so cross the Kill von Kull exists, nor is there any legislation which empowers generally the crossing of any navigable interstate water. Complainants claim, however, that such congressional authority was secured by the permit already referred to from the Secretary of War. This authority, as already noted, was a "permission revocable at will by the Secretary of War" to lay water mains under such Kill in accordance with the recommendations of the chief of engineers of the United States army upon certain conditions. Section 10 of the act of Congress approved March 3, 1899 (30 Stat. c. 425, pp. 1121–1151), the basis for such permit or license, reads as follows:

"Sec. 10. That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established except on plans recommended by the chief of engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition or capacity of any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or enclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the chief of engineers and authorized by the Secretary of War prior to beginning the same."

[2] Upon the only ground of demurrer considered, the question is thus reduced: Is this authority from the Secretary of War plenary or merely permissive? So far as applicable to the present question, such section may be summarized thus: First, the creation of any obstruction to the navigable capacity of any waters of the United States is prohibited unless affirmatively authorized by Congress; second, it shall not be lawful to build any structure in a navigable river or water of the United States, except on plans recommended by the chief of engineers. and authorized by the Secretary of War; and, third, it shall not be lawful to excavate or fill the channel of any navigable

water of the United States unless such work is recommended by said Secretary of War prior to beginning the same.

This section was construed in Cobb v. Lincoln Park, 202 Ill. 427, 67 N. E. 5, 63 L. R. A. 264, 95 Am. St. Rep. 258, and Wilson v. Hudson County Water Co., 76 N. J. Eq. 543, 76 Atl. 560 (the defendant in the last case being the Water Company in the case at bar, and the question there considered being the same as raised here). In both of these it was held that the Secretary of War's authorization was a mere license to do the work and not a grant of power to do it. In the latter case V. C. Walker, adopting the view of the Illinois court, said:

"The doctrine of Cobb v. Lincoln Park as applicable to the case under consideration may be paraphrased as follows: The provisions of section 10 of the river and harbor act of March 3, 1899, were designed to protect the navigable waters of the United States (including the Kill von Kull) from encroachment and from obstructions to navigation, and to commit the duty of their protection to an officer of the general government without whose permission no such obstructions can be made; that the act is a mere regulation for the benefit of commerce and navigation, and that the license or permission of the Secretary of War is only a finding and declaration that a proposed structure or excavation would not interfere with or be detrimental to navigation, and is not equivalent to a positive declaration by the authority of Congress that the licensee may make such obstruction or excavation without first obtaining the consent of the owner of the submerged land; that the Water Company, not having by the law of this state the right to excavate on the submerged lands without the state's consent, could not acquire that right by obtaining a license from the Secretary of War; that the act is not a declaration touching the rights of the owner of the submerged lands in question, and, assuming that the permission of the general government to the excavation and laying of the proposed pipe line is necessary, such permission is not given to override the rights of the owner of the submerged lands, namely, the state of New Jersey, and it is, as said, the declaration by the guardian of the interests of the public at large that the proposed work will not interfere with navigation, and is strictly permissive, and not an authorization by paramount authority to do the work proposed. Thus it appears that the cases in principle are parallel. The Water Company contends for the right to lay its pipe line across the Kill von Kull in lands under water belonging to this state because it alleges that it is engaged in interstate commerce, which may be conceded (Kansas City Natural Gas Co. v. Haskell [C. C.] 172 Fed. 545), and relies upon the language of Mr. Justice Bradley, speaking for the Circuit Court, in Stockton v. Baltimore & N. Y. R. Co., 32 Fed. 20, where he says: 'We think that the power to regulate commerce between the states extends not only to the control of the navigable waters of the country and the lands under them for the purpose of navigation, but for the purpose of erecting piers, bridges, and all other instrumentalities of commerce, which, in the judgment of Congress, may be necessary or expedient.' Conceding to this language all that is claimed for it, it is nevertheless perfectly apparent that nowhere in the tenth section of the river and harbor act of 1899 is there any intention, expressed or implied, to grant to any person or corporation the right to lay a pipe line under navigable waters in lands belonging to a state or individual for the purpose of transporting any merchantable commodity whatever. The only intention discoverable is, as already said, the authorization of such a work if it may be lawfully done, and the intention is to authorize it to be done only in such way as to prevent its being any obstruction to navigation. Congress may some day be induced to enact a law under the commerce clause of the federal Constitution which will make a grant of power such as is contended for by the Water Company in this case, but up to the present time it has not done so, and the Water Company, without a grant of power, is seeking to prosecute

an unlawful work—a work not unlawful in and of itself, but unlawful so far as it appropriates the land and invades the rights of the state of New Jersey, and this by obtaining a mere license from a supervisory power, a license to do the thing desired, efficacious only if and when lawful authority to prosecute the work shall have been obtained. In this connection it may be observed that the tenth section of the river and harbor act does not provide that it shall be lawful for the Secretary of War to authorize the excavation of land in the channel of any navigable waters of the United States, but only that it shall not be lawful to do the work without the authorization of the Secretary, had before beginning the work. The section as worded clearly contemplates that the consent of the Secretary shall merely be permissive of the doing of work for which authority already exists."

While these decisions are not binding upon this court, they should not be disregarded unless it clearly appears that they are founded in error. In the New Jersey case will be found a critical review of the authorities relied upon by the complainants in this case. The complainants contend that such case does not give due effect to the cited authorities; but I have carefully considered such authorities, and I concur with the conclusion reached by V. C. Walker that they do not support the contention of complainants' counsel that a license obtained by the Water Company from the Secretary of War is plenary in its character. It is further contended, however, that the construction thus placed upon section 10 of the act of 1899 is erroneous, and that, first, unless such section be so construed as to empower the Secretary of War to authorize the excavation and filling, etc., of interstate waters in the first instance without resort to Congress, violence will be done to the word "authorize" as used in that section, in view of the use by Congress of the word "approve" in section 9, where permission only was intended to be expressed; and, second, that, unless such construction be given, it was unnecessary to change or modify the seventh section of the act of 1890 (Act Sept. 19, 1890, c. 907, 26 Stat. 454).

[3] Considering the question from the viewpoint of these criticisms, an extended examination of the pertinent sections of the acts of 1890 and 1899 is necessary. Section 7 of the earlier act is as follows:

"Sec. 7. That it shall not be lawful to build any wharf, pier, dolphin, boom, dam, weir, breakwater, bulkhead, jetty, or structure of any kind outside established harbor lines, or in any navigable waters of the United States where no harbor lines are or may be established, without the permission of the Secretary of War, in any port, roadstead, haven, harbor, navigable river, or other waters of the United States, in such manner as shall obstruct or impair navigation, commerce, or anchorage of said waters, and it shall not be lawful hereafter to commence the construction of any bridge, bridge draw, bridge piers and abutments, causeway or other works over or in any port, road, roadstead, haven, harbor, navigable river, or navigable waters of the United States, under any act of the legislative assembly of any state, until the location and plan of such bridge or other works have been submitted to and approved by the Secretary of War, or to excavate or fill, or in any manner alter or modify the course, location, condition, or capacity of the channel of said navigable water of the United States, unless approved and authorized by the Secretary of War: Provided, that this section shall not apply to any bridge, bridge draw, bridge piers, and abutments, the construction of which has been heretofore duly authorized by law, or be so construed as to authorize the construction of any bridge, draw bridge, bridge piers and abutments, or other works, under an act of the Legislature of any state, over

or in any stream, port, roadstead, haven or harbor, or other navigable water not wholly within the limits of such state."

And the first sentence of section 10 (the only part necessary to be considered) is as follows:

"That the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters, in respect of which the United States has jurisdiction, is hereby prohibited."

It will be observed that section 7 consists of three distinct prohibitions followed by a proviso in the nature of a limitation. Complainants concede that this section was permissive, but contend that it applies exclusively to intrastate waters. This contention in my judgment is ill founded. Without the proviso this section would be applicable to all structures and other works in all navigable waters. 21 Ops. Atty. Gen. 41. And the exception in favor of intrastate waters contained in such proviso is limited to bridges and similar constructions authorized by state law. 22 Ops. Atty. Gen. 332. So far as wharves and the other structures mentioned in the first part of this section are concerned, the prohibition, without the Secretary of War's permission, applied only if they obstructed or impaired the navigation, commerce, or anchorage of said waters. The third prohibition contains no reference to state authority, and seemingly was not subject to such limitation. 22 Ops. Atty. Gen. 332. This section, therefore, did not deal exclusively with intrastate waters. Neither does section 9 of the act of 1899, as contended by complainants, apply exclusively to intrastate waters. This section is as follows:

"Sec. 9. That it shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the chief of engineers and by the Secretary of War: Provided, that such structures may be built under authority of the Legislature of a state across rivers and other waterways the navigable portions of which lie wholly within the limits of a single state, provided the location and plans thereof are submitted to and approved by the chief of engineers and by the Secretary of War before construction is commenced: And provided further, that when plans for any bridge or other structure have been approved by the chief of engineers and by the Secretary of War, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the chief of engineers and of the Secretary of War."

It will be noted that this section applies to all navigable waters of the United States; that it does not embrace all the structures and works embraced by section 7 of the earlier act, but is limited to bridges, dams, dikes, and causeways; and that the construction of these are prohibited without the consent of Congress, except such as cross waters the navigable portions of which are wholly within the limits of a single state, and which are to be built by state legislative authority. Congressional consent to the building of such structures in all other navigable waters is still

necessary by this section. Nor, as contended by complainants, does section 10 of the 1899 act apply only to interstate waters. There is nothing in this section that restricts it to interstate waters. The first part which prohibits "the creation of any obstruction not affirmatively authorized by Congress to the navigable capacity of any of the waters of the United States" not only comprehends the kind of structures specifically referred to by section 9, but all others that may be an obstruction to the navigable capacity of the waters of the United States, regardless of whether they are interstate or intrastate.

Manifestly bridges, dams, dikes, and causeways are not the only structures that obstruct the navigable capacity of such waters, and the prohibition with which section 10 begins would be utterly unnecessary and meaningless if the same were limited to the character of structures dealt with in the preceding section. Such meaningless legislation is not to be imputed unless there is no escape from such result. The remainder of this section shows other structures and works, any of which may prove an obstruction to the navigable capacity of such waters. These are the same as are mentioned in section 7 of the earlier act, and which are not found in section 9 of the act of 1899, and of necessity are included within the prohibition of the first part of such section, if it is to have any meaning or operation.

[4] What is affirmative authorization? Affirmative is the antithesis of negative. The use of the word "affirmatively" with "authorized" would be difficult to understand except for the use of the word "authorize" in the latter part of this section where the building of certain structures and the performing of certain works are forbidden without the authority of the Secretary of War. As pointed out by V. C. Walker in the New Jersey case, this section "does not provide that it shall be lawful for the Secretary of War to authorize the excavation of land in the channel of any navigable water of the United States, but only that it shall not be lawful to do the work without the authorization of the Secretary and before beginning the work." In view of the context, the word "affirmatively" was legislatively used to distinguish the two kinds of authority referred to, and to make it plain that the initial authorization to create an obstruction was not to rest on implied, but express—affirmative—congressional authority.

[5] What is navigable capacity? Does it not mean the capability of being navigated over any part of the waters when in their normal condition?

And how can it be said that the structures or the works subsequently referred to in this section may not amount to an obstruction to such navigable capacity? It is to be noted that "excavate or fill" is associated with "alter or modify the course, location, condition, or capacity of any" navigable water, all of which may be so performed as to become serious obstructions to navigation. That such obstructions may be but slight, and that some will be of only temporary duration, would not make them any less obstructions, and within the prohibition.

Any less comprehensive interpretation of the first part of section 10 would do violence to its language, and, as already said, be meaningless. If Congress intended that as to all other obstructions not prohibited by section 9, no affirmative action by Congress should be necessary, but that they might be constructed upon obtaining the permission of the Secretary of War it used singularly inapt and ambiguous language in expressing such intention.

The use of the word "authorize" instead of "approve" does not change the Secretary of War's act from permissory to plenary. Two of the definitions of the word "authorize" are to approve of; to formally sanction. Cent. Dict. & Cyc. What does the Secretary of War authorize? Not the building of the structures mentioned in the second part of this section, but the plans to which such construction is to conform. And what does he authorize as to excavating, filling, altering, etc., of the channel of navigable waters, but the commencement, the character, and the manner of doing such work? While the language here employed is not as felicitous and clear as it might be, yet, when it is considered that Congress was here revising and amending, any other interpretation than that such official action by the designated executive officer was to be had only after the initial power to do such works shall have been procured from Congress would be to unnecessarily limit the plain and unambigous language used in the first part of this section by which full control over all the works in interstate waters was kept in Congress itself.

Authority to excavate and lay a pipe line in the bed of the Kill von Kull is one thing, and authority relating to the time when and the plans in conformity to which the work is to be done is another. The Secretary of War's authorization is supervisory, and relates to the character and performance of the work, and not the directing or authorizing it to be done in the first instance. Section 9 clearly evinces that Congress intended to keep to itself the initial authorization of the crossing of interstate waters by bridges, dams, etc., and section 10 affords no presumption that in respect to the structures and works specifically referred to therein it intended to delegate such initial authorization to the Secretary of War. The first part of such section unambiguously embraces them, and the remainder does not disclose an intent to effect an exception.

[6] Something more than a mere change of expression, particularly when the different word is not different in all its meanings, is therefore necessary to show a legislative intent to effect a so radically different purpose. It is also to be noted that this requirement in the first part of section 10 of the act of 1899 effects a radical change in the legislative purpose of the earlier act. As noted, section 10 of the act of 1890 prohibited the creation of any obstruction to the navigable capacity of any water not affirmatively authorized by *law,* while the first part of section 10 of the later enactment required this affirmative authorization to be made by an *act of Congress.*

In United States v. Bellingham Boom Co., 176 U. S. 211, 20 Sup. Ct. 343, 44 L. Ed. 437, this clause of section 10 of the act of 1890, contrary to the contention of the government, was held not to re-

strict the authorization by law to laws enacted by Congress, but that it included authorization by state legislation, where the obstruction was in a navigable stream confined wholly within a single state; the court saying in this behalf:

"Congress, it must be assumed, was aware of the fact that until it acted upon the subject of navigable streams, which were entirely within the confines of a single state, although connecting with waters beyond its boundaries, such state had plenary power over the subject of that navigation, and it knew that, when in the absence of any statute of Congress on the subject an obstruction to such a navigable river had been built under the authority of an act of the Legislature of the state, such obstruction was legal and affirmatively authorized by law, because it was so authorized by the law of a state at a time when Congress had passed no act upon the subject. When Congress in 1890 passed the river and harbor bill, we think the expression contained in section 10 in regard to obstructions 'not affirmatively authorized by law' meant not only a law of Congress, but a law of the state in which the river was situated, which had been passed before Congress had itself legislated upon the subject. An obstruction created under the authority of a state statute under such circumstances we cannot doubt was an obstruction 'affirmatively authorized by law.'"

In that case the government sought to have removed from an intrastate stream a boom authorized by the law of the state, and it is significant that, while the appeal from the Circuit Court of Appeals' decision (81 Fed. 658, 26 C. C. A. 547) was pending in the Supreme Court, the law was changed and made to require affirmative congressional action in all cases where the navigable capacity of any United States water was obstructed. The act of 1899 produced radical changes in the matter of constructing works in both intra and inter state waters.

[7] As the law stood immediately before the act of 1899 was passed, the initial authorization of the Congress to create obstructions to the navigable capacity of an intrastate water was not necessary if state legislative authority for such construction had been obtained, and the building of wharves and other structures mentioned in the first part of section 7 of the act of 1890, in any United States navigable water, was only prohibited without the permission of the Secretary of War, if they obstructed or impaired navigation, commerce, or anchorage. The erection of bridges and their appurtenances over intrastate waters was permitted without the need of the approval of the Secretary of War, if authorized by law before the passage of said act. The excavating, filling, altering, etc., the channel of navigable waters was permitted if approved and authorized by the Secretary of War.

Among the changes effected by the act of 1899 was to require the affirmative authorization by Congress to create any obstruction to the navigable waters of the United States, except that bridges, dams, dikes, and causeways in or across waters the navigable portions of which lie wholly within the limits of a single state was permitted if authorized by state legislation and the location and plans of such structure were approved by the chief of engineers and of the Secretary of War. Perhaps without the change from "authorized by law" to "authorized by Congress" no obstruction to the navigable capacity of interstate waters without affirmative congressional enactment

would have been lawful, but a present reading of the law in the light of the history of its enactment clearly evinces to my mind a legislative purpose to require affirmative action on the part of Congress before such a crossing of interstate streams as contemplated by complainants in this suit shall be permitted, and that only when such congressional action shall have been taken can the powers delegated to the Secretary of War be put into operation.

This is not a case of the United States government seeking to make a crossing of this interstate stream in the exercise of its governmental powers, but an attempt to override a sovereign state's opposition to the use of its submerged land by a corporation of its own creation, under the claim of being engaged in interstate commerce. This can only be successfully accomplished when it shall be shown that Congress in the assertion of its superior rights under the interstate commerce clause of the United States Constitution has clearly and definitely authorized such crossing. Until then the state of New Jersey as against every comer is sovereign master of the situation.

The complainants' equities as set up in this suit being dependent upon the Water Company having obtained from Congress the right to enter upon and cross the lands of the state of New Jersey submerged by the waters of the Kill von Kull, and no such authority appearing, the bill is dismissed.